1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEBRASKA

2

BRIENNE SPLITTGERBER,      )    Case No. 8:17-cv-280

3                             )
       Plaintiff,         )

4                             )    DEPOSITION OF
   vs.                     )    <u>BRADLEY RICE</u>

5                             )    TAKEN ON BEHALF OF
THE STATE OF NEBRASKA,     )    PLAINTIFF

6 THE NEBRASKA STATE PATROL,   )
DR. STEPHEN HAUDRICH, an     )

7 individual, BRADLEY RICE,    )
an individual, DAVID        )

8 SANKEY, an individual,      )
JOHN AND JANE DOES,         )

9 individuals,              )
                            )

10       Defendants.        )

11

12

13

    Taken at the law offices of Anderson, Creager &

14    Wittstruck, PC, LLO, 1630 K Street, Lincoln,
          Nebraska, on **September 10, 2018**,

15            commencing at 9:01 a.m.

16

17

18

19

20

21

22

23

24

25

```
 1                  A P P E A R A N C E S

 2   For the Plaintiff:      MR. THOMAS M. WHITE
                             WHITE AND JORGENSEN
 3                           3114 St. Mary's Avenue
                             Omaha, NE  68105
 4
     For Defendants State of  MS. JESSICA M. FORCH
 5   Nebraska, Nebraska       ASSISTANT ATTORNEY GENERAL
     State Patrol and Sankey: 2115 State Capitol
 6                            P.O. Box 98920
                              Lincoln, NE  68509-8920
 7
     For Defendant Haudrich:  MR. DAVID D. ERNST
 8                            PANSING HOGAN ERNST &
                                 BACHMAN, LLP
 9                            10250 Regency Circle
                              Suite 300
10                            Omaha, NE  68114

11   For Defendant Rice:      MR. ROBERT B. CREAGER
                              ANDERSON, CREAGER &
12                               WITTSTRUCK, PC, LLO
                              1630 K Street
13                            Lincoln, NE  68508

14   Also Present:            Ms. Mary Jo Gunnels

15

16

17

18

19

20

21

22

23

24

25
```

```
1                       I N D E X

2            APPEARANCES . . . . . . . . . . .   2

3            STIPULATIONS  . . . . . . . . . .   4

4            REPORTER'S CERTIFICATE  . . . . . .  59

5

6   WITNESS:

7       Bradley Rice

8       Direct Examination by Mr. White . . . . . . . .   5

9       Cross-Examination by Mr. Ernst  . . . . . . .  27

10      Cross-Examination by Mr. Creager  . . . . . .  28

11      Redirect Examination by Mr. White . . . . . .  45

12      Recross-Examination by Mr. Ernst  . . . . . .  54

13

14                        * * * * *

15

16

17

18

19

20

21

22

23

24

25
```

1           S T I P U L A T I O N S

2           It is stipulated and agreed by and between the

3    parties hereto:

4           1.   That the deposition of Bradley Rice may be

5    taken before Marcy Benge, RMR, General Notary Public,

6    at the time and place set forth on the title page

7    hereof.

8           2.   That the deposition is taken pursuant to

9    notice.

10          3.   That the original deposition will be

11   delivered to Mr. Thomas M. White, Attorney for

12   Plaintiff.

13          4.   That all objections except as to form and

14   foundation are reserved until time of trial.

15          5.   That the testimony of the witness may be

16   transcribed outside the presence of the witness.

17          6.   That the signature of the witness to the

18   transcribed copy of the deposition is waived.

19

20

21

22

23

24

25

1                          <u>**BRADLEY RICE**</u>,

2              of lawful age, being first duly
               cautioned and solemnly sworn as
3           hereinafter certified, was examined
               and testified as follows:
4

5        (Witness's response to oath:  "Yes, ma'am.")

6                    MR. WHITE:  We are off the record for a

7    moment.

8                         (At this time an off-the-record

9                         discussion was had.)

10                        <u>DIRECT EXAMINATION</u>

11   BY MR. WHITE:

12        Q.      Please state your name.

13        A.      Bradley D. Rice, R-i-c-e.

14        Q.      And, Mr. Rice, can you tell me, at one

15   time were you employed by the State of Nebraska?

16        A.      Yes, sir.

17        Q.      And what position or positions did you

18   hold while working at the State of Nebraska?

19        A.      From the beginning?

20        Q.      Roughly, yeah.

21        A.      I was sworn as a trooper in 1981, retired

22   as a captain in the end of 2011, I think.  I'd have

23   to think about that.  And then appointed as the

24   superintendent in '15.  And dismissed as the

25   superintendent last year, in '17.

1       **Q.**    Now, Mr. Rice, did you become aware of a

2   claim made by a Trooper Splittgerber regarding the

3   nature of medical examinations that were being

4   required of women as a precondition to employment in

5   the state patrol?

6       **A.**    Yes.

7       **Q.**    Prior to Ms. Splittgerber's concerns, had

8   you ever heard of any complaints about the nature of

9   the physical examinations required in order to -- for

10  a woman to become a state patrol officer?

11      **A.**    No.

12      **Q.**    Doctor -- the doctor that performed this

13  examination required of women like Trooper

14  Splittgerber to engage in a series of, I guess,

15  postures or movements that required the display of

16  their genitalia and their anus.  Did you -- were you

17  aware of that prior to Trooper Splittgerber's

18  examination?

19      **A.**    No.

20      **Q.**    So you didn't know that these things were

21  being required by at least some physicians employed

22  by the state patrol of women candidates?

23      **A.**    No.

24      **Q.**    You did not know?

25      **A.**    No.

1          Q.     Okay.   I just want to make sure we don't

2     have a double negative going.   Were you aware of that

3     procedure?  Yes or no.

4          A.     Are you asking me when?   If I was aware

5     before I spoke to Brienne?

6          Q.     Yes.

7          A.     No.

8          Q.     Now, the state patrol has a form

9     requiring candidates to not only submit to a physical

10    examination, but to have various areas of physical

11    concern checked.   Are you aware of that?

12         A.     Yes.

13         Q.     Prior to Trooper Splittgerber's

14    complaints, were you aware of the nature of the form?

15         A.     No.

16         Q.     Can you tell me, sir, who would have

17    prepared that form stating what would be required of

18    a trooper candidate?

19              MR. CREAGER:  Just object to form only as

20    to the timeline, because when he was

21    superintendent --

22              MR. WHITE:  Fair enough.

23              MR. CREAGER:  -- is different from when

24    she --

25              MR. WHITE:  Right.

1    Q.     (By Mr. White)  At any time during your

2    employment in the state patrol, did you ever become

3    aware of who would create the checklist for a

4    physical examination of a trooper candidate?

5    A.     I'm trying not to make it difficult.  Ask

6    me your question again.

7    Q.     Sure.  Any time you have a problem with

8    my questions, Mr. Rice, you just tell me that.

9    That's not being difficult.  That's being precise,

10   and it's appreciated.

11        All right.  Had you ever examined the

12   form that the state patrol required candidates to

13   fill out as part of their preemployment physical

14   prior to Trooper Splittgerber's complaints?

15   A.     No.

16   Q.     Did you have to pro- -- fill out a form

17   like that when you were a candidate, do you know?

18   A.     Yes.

19   Q.     Was it the same form, to your

20   recollection, as the one that Splitt- -- Trooper

21   Splittgerber filled out?

22   A.     No.

23   Q.     Okay.  How was it different, to the

24   extent you can remember, sir?

25   A.     My form wasn't as long.  You know, that's

1   40 years ago.

2      **Q.**   Sure.

3      **A.**   And I can't tell you what was on it.  I

4   just know there was a form, asked some questions.  I

5   don't even know what those questions are now.

6      **Q.**   Okay.  Do you recall in your examination

7   whether the physician made you open up your buttocks

8   and display your anus?

9      **A.**   Yes.

10      **Q.**   They -- he did make you display your anus

11   when you were being examined 40 years ago?

12      **A.**   Yes.

13      **Q.**   Did the physician, he or she, tell you

14   the purpose of that?

15      **A.**   No.

16      **Q.**   Okay.  They just said, "Lift your

17   buttocks up"?

18      **A.**   Well, I don't -- I don't -- I don't

19   recall what they exactly said.  But it was a male

20   physical.

21      **Q.**   Okay.  And was it a male physician

22   performing this?

23      **A.**   Yes.

24      **Q.**   Now, as the colonel in charge, when you

25   were in charge of the patrol, was it ever an

1    intention that you formed that female candidates

2    would have to remove their pants and underwear, lay

3    on their back on an exam table, put their legs, feet

4    together, pull them up to their buttocks, and then

5    open their knees to display their genitalia?

6             MR. ERNST:  Object to the form.

7             MR. CREAGER:  Yeah.  Me, too.

8        Q.    (By Mr. White)  You can go ahead and

9    answer.

10       A.    Okay.  Re- -- there was a key part of

11   your question at the beginning.  Would you repeat the

12   beginning of your question?

13            MR. WHITE:  Would you please read back

14   the question?

15            THE COURT REPORTER:  Sure.

16                 (The requested portion of the record

17                 was repeated.)

18       A.    Explain to me what you mean by an

19   intention that I formed.

20       Q.    (By Mr. White)  Okay.  Did you instruct

21   physicians that that procedure was necessary for a

22   female to pass or intend to require that as a

23   necessary examination technique required for females

24   to pass the physical and become candidates to become

25   state troopers?  Did you endorse the technique?

1              MR. ERNST:  Object to the form.

2              MR. CREAGER:  Yeah.  And just -- I object

3    to the form and foundation, because it assumes that

4    he had anything to do with the -- the form.

5              MR. WHITE:  No.  If he didn't, Bob, it

6    doesn't.  Because if he didn't form the intention --

7              MR. CREAGER:  Okay.  I'll just make my

8    objection.

9              MR. WHITE:  If he didn't form the

10   intention, then of course he had nothing to do with

11   it.  Then the answer is no.

12             MR. CREAGER:  Okay.  Well, I get that,

13   but -- all right.  Just note my objection.  You can

14   answer if you understand the question.

15       A.    The question as I understand it is no.

16       Q.    (By Mr. White)  Okay.  No, you didn't

17   have any personal determinations on how these

18   examinations should be conducted; is that correct?

19       A.    That's correct.

20       Q.    All right.  Did you at any time while you

21   were the colonel take the Nebraska State Patrol form

22   and run it by doctors to see what would be

23   appropriate examinations to qualify candidates for

24   becoming troopers?

25       A.    No.

RICE - Direct

1       Q.    Why not?

2       A.    I -- I instructed -- I instructed staff

3   to go over the form and make sure every -- everything

4   on the form was absolutely necessary.

5               MR. CREAGER:  I'm -- just for -- I'm

6   going to just make a foundational objection, because

7   you guys are on different timelines and I can hear

8   where this is going.  He's answered the question, but

9   please establish when this is happening.  Because --

10              MR. WHITE:  I asked him -- read the

11  question back.  I think -- let me help you out, Bob.

12  I said when he was a colonel.  Please read the

13  question back.

14              MR. CREAGER:  Well, that got lost in the

15  next question.

16              MR. WHITE:  Please read it back.

17              MR. CREAGER:  Listen to the question,

18  will you?

19                  (The requested portion of the record

20                  was repeated.)

21              MR. CREAGER:  He said no.  And the next

22  question was?

23                  (The requested portion of the record

24                  was repeated.)

25              MR. WHITE:  I have a phonographic memory,

1   Bob.  I'm just telling you.  I truly do.
2              MR. CREAGER:  I have a phonographic
3   memory.
4              MR. WHITE:  Phonographic.
5              MR. CREAGER:  I know songs and music.  So
6   listen carefully to the question.
7        Q.    (By Mr. White)  Why not?
8        A.    Why didn't I do that?
9        Q.    Yeah.
10       A.    I had staff that do that.
11       Q.    Okay.  Who did you ask to do that?
12       A.    In a -- in a staff meeting, I asked
13   attorney -- the state patrol attorney, Wendy Wussow,
14   and HR director, Jerry Lee Jensen.
15       Q.    Was that before or after Trooper
16   Splittgerber's complaints?
17       A.    After.
18       Q.    And did you receive any reports from them
19   after you asked --
20       A.    Yes.
21       Q.    -- those questions?  And what did the
22   reports state?
23       A.    I -- I received verbal briefings.  I
24   don't recall any written reports.
25       Q.    Okay.  What were the verbal briefings?

1    A.    The verbal briefings were that the -- the

2    physician, Dr. Haudrich, was following the

3    requirements set forth in PSAC standards.

4    Q.    Did you see anywhere in the documents

5    where it said that a visual inspection of the female

6    genitalia was required?

7            MR. ERNST:  Object on foundation.

8            MR. CREAGER:  Same.

9            MR. WHITE:  Simple question.  I asked him

10   if he saw, David.

11   A.    No.

12   Q.    (By Mr. White)  Okay.  Do you recall

13   seeing that there was a question regarding urinary

14   tract infections?

15   A.    No, I don't.

16   Q.    Okay.  Who made the verbal reports to you

17   that Dr. Haudrich was following what was required?

18   A.    Both attorney Wendy Wussow and HR

19   director Jerry Lee Jensen.

20   Q.    Did they describe to you what they did to

21   check on that?

22   A.    Attorney Wendy Wussow told me she -- I

23   instructed her to do research, to research what

24   was -- what we were asking them to do, what was being

25   required of us to do.  And her report back to me was

RICE - Direct

1    that the procedures that Dr. Haudrich were -- were

2    using -- and I don't know if that's the right word or

3    not.  Procedure, examination.  I'm just laymen's

4    terms.  Were -- were following the guidelines as set

5    forth by PSAC.

6                And Jerry Lee Jensen had sent one of her

7    personnel down to speak with folks at Dr. Haudrich's

8    office to check on what they were doing, and the

9    report that came back from them was -- from her

10   department was that they were using techniques,

11   procedures -- whatever the term is, I don't know for

12   sure -- that would accomplish the requirements for

13   PSAC.

14        Q.    Did, to your knowledge, anyone on your

15   behalf while investigating this check out the

16   techniques with other physicians other than

17   Concentra, Dr. Haudrich's employer, about whether the

18   procedures being employed were, in fact, appropriate?

19        A.    I don't know.

20        Q.    Did you personally ask any women you

21   might know whether they had ever encountered an

22   examination of the type performed by Dr. Haudrich on

23   Trooper Splittgerber?

24        A.    No.

25        Q.    Did you personally talk to any physicians

RICE - Direct

1    to see whether or not the procedures employed by

2    Dr. Haudrich were of the type that should be

3    performed in the course of such an examination?

4         A.    No.

5         Q.    Did you ever ask any physicians to speak

6    to Trooper Splittgerber about how the actual

7    examination was performed in order to evaluate its

8    necessity?

9         A.    No.

10        Q.    How did you learn of Trooper

11   Splittgerber's concerns regarding the nature of the

12   physical examination?

13        A.    In a -- in a meeting she -- that she

14   asked for with me, she told me.

15        Q.    Okay.  Do you know whether Trooper

16   Splittgerber prior to that meeting had raised

17   concerns with other officers in the state troop- --

18   among the state troopers?

19        A.    Yes.

20        Q.    Who had she raised, to your knowledge,

21   those concerns with?

22        A.    Through her chain of command at the --

23   when she was attending the academy.

24        Q.    And who was in that chain of command, to

25   the best of your knowledge?

1      A.    I -- I know Captain Williams was in

2  charge of the training academy at that time, but I --

3  I'm not sure who were -- who were the sergeants and

4  lieutenant.

5      Q.    Was any of that information raised to

6  you -- well, first of all, were you the colonel at

7  that time?

8      A.    No, sir.

9      Q.    Were you at the State Troopers

10  Association at that time?

11      A.    No, sir.

12      Q.    So -- so you were not working for the

13  state patrol at the time that Ms. -- Trooper

14  Splittgerber first raised concerns.  Accurate?

15      A.    True.

16      Q.    And then how long after she first raised

17  concerns did you return as the superintendent of the

18  patrol?

19          MR. CREAGER:  If you know.

20      A.    I don't know for sure.  I'd have to look.

21  I don't know.

22      Q.    (By Mr. White)  And how long after you

23  became colonel of the state patrol did you learn of

24  Trooper Splittgerber's concerns?

25      A.    A year and a half.

1    **Q.**    At any time were you advised that Trooper

2    Splittgerber restated her concerns because she feared

3    other female candidates would be subject to the same

4    examination by Dr. Haudrich or others employed by the

5    state patrol?

6    **A.**    She told me that.

7    **Q.**    Okay.  So she said at that point she

8    wanted to prohibit -- or to stop examinations of this

9    type unless they were absolutely necessary, or words

10   to that effect?

11   **A.**    Yes.

12   **Q.**    And did another class of female troopers

13   go forward subject to the same type of examinations

14   that were given to Trooper Splittgerber, to your

15   knowledge?

16   **A.**    Another class came through.  I can only

17   assume that they had the same examination.

18   **Q.**    Did you ever ask people to investigate

19   whether Dr. Haudrich's examinations were consistent

20   with the examinations performed by other physicians

21   who were engaged to physically examine potential

22   female troopers?

23   **A.**    Yes.

24   **Q.**    And what did you discover?

25   **A.**    I gave that assignment to legal counsel,

RICE - Direct

1   Wendy Wussow, and she reported back to me that it was

2   consistent.  It was an accepted medical practice.

3       Q.   Okay.  Does that mean that all the

4   doctors did the same thing --

5       A.   I don't --

6       Q.   -- or did you understand --

7       A.   I do not know.

8       Q.   Now, counsel, Ms. Wussow, also wrote a

9   letter saying that the examination of the external

10  parts of the female anatomy were necessary to -- to

11  determine whether hernias existed.  Do you recall

12  that?

13      A.   Yes.

14      Q.   Have you received any information since

15  that time that that's simply nonsense?  That's not

16  why those examinations, if there is any real reason

17  for them, were conducted?

18           MR. ERNST:  Object to the form.

19      A.   Yes.

20      Q.   (By Mr. White)  Okay.  Why would attorney

21  Wussow tell Trooper Splittgerber that the exposure of

22  her genitalia and anus was required to detect if

23  there's a hernia when that's simply not true?

24           MR. CREAGER:  Object to the form.

25      Q.   (By Mr. White)  Why was Splittgerber so

1    advised?

2                    MS. FORCH:  Form and foundation.

3                    MR. ERNST:  Form and foundation.

4                    MR. CREAGER:  Yeah, everybody will be on

5    that one.  And you can answer, if you know.

6        Q.    (By Mr. White)  Did it as the colonel

7    cause you any concern to find out that one of your

8    troopers was told the reason for a very invasive

9    personal examination, the reason given was totally

10   false?  Did that concern you?

11                   MR. ERNST:  Object to the form.

12                   MS. FORCH:  Object to the form of the

13   question.

14                   MR. CREAGER:  Join the objection.

15       A.    I was not superintendent when I learned

16   of that.

17       Q.    (By Mr. White)  Okay.  So you didn't know

18   at the time that attorney Wussow had told Trooper

19   Splittgerber it was to check for hernias?  Is that

20   accurate?

21       A.    No.  I knew that.  I saw the letter.

22       Q.    Okay.  So you were superintendent at the

23   time the letter went out; is that correct?

24       A.    That's correct.

25       Q.    But you didn't know that information was

```
1   false?
2               MR. ERNST:  Object to the form.
3               MS. FORCH:  Form.
4       Q.    (By Mr. White)  At that time?
5       A.    True.
6       Q.    Okay.  When did you learn that that was
7   not a legitimate reason to perform the examination of
8   the types performed by Dr. Haudrich?
9               MR. ERNST:  Object to the form.
10      A.    I think you're placing words in my mouth
11  now.  I only learned that there was -- that -- I
12  learned through the last meeting with my legal
13  counsel that --
14      Q.    (By Mr. White)  Don't talk to me about
15  that, then.  We'll stop right there.
16      A.    Okay.
17      Q.    Okay.  We'll stop.  Were you aware while
18  you were still colonel that the reason provided by
19  Ms. Wussow for the examination performed on Trooper
20  Splittgerber was false, not true?  Did you learn that
21  while you were still a colonel?
22      A.    No.
23      Q.    Okay.  So it was only after you left the
24  employ of the state patrol; correct?
25      A.    True.
```

1    **Q.**    Did you at some point in time ask out

2    loud in front of others, "Why are we doing this?  Do

3    we have to know if they have weird looking vaginas?"

4    or words to that effect?  Did you ever say that?

5        **A.**    No.  I don't recall that.

6        **Q.**    And if others recall you saying that?

7        **A.**    I don't recall saying that.

8        **Q.**    Okay.  Now, the form you said -- or you

9    had repeatedly referred to some authority that said

10   this is the form -- these are the exams we need and

11   the kinds of forms we need.  Who was that?

12       **A.**    Say it again?

13       **Q.**    Peace officers association or something?

14       **A.**    Oh, Police Standards Advisory Council

15   that sets the standard -- physical standards for all

16   police officers in the state of Nebraska.

17       **Q.**    Okay.  And that form is compliant with

18   that; correct?

19       **A.**    Yes.

20       **Q.**    Now, one of the concerns expressed is

21   whether or not the candidate has hemorrhoids.  Were

22   you aware of that?

23       **A.**    Yes.

24       **Q.**    Were you aware that in Trooper

25   Splittgerber's case, no history was asked, "Have you

1    ever had a problem with bowel movements, itching,

2    pain in your anus?"  No question of any history?

3         A.    No.

4         Q.    Another one was urinary tract infections,

5    is what the form says.  It doesn't say anything about

6    sexually transmitted diseases or anything.  It just

7    says urinary tract.  Were you aware that no history

8    was asked --

9         A.    No.

10        Q.    You have to let me finish.

11        A.    I'm sorry.

12        Q.    -- of Trooper Splittgerber about whether

13   she had had a history of painful urination or other

14   symptoms of a urinary tract infection?

15        A.    No.

16        Q.    Were you aware that Trooper Splittgerber

17   at no time during the examination was told for the

18   purpose of why she was required to expose herself in

19   these ways?

20        A.    No.

21        Q.    Once you became more aware -- or became

22   aware of Trooper Splittgerber's concerns, other than

23   delegating the matter to Ms. Wussow and -- I forget

24   who the other one was?

25        A.    HR director, Jerry Lee Jensen.

```
 1        Q.     Okay.  Mr. Jensen?

 2        A.     It's Mrs. Jensen.

 3        Q.     Mrs. Jensen.  Did you take any other

 4   steps?

 5        A.     No.

 6        Q.     So is there any part of your interaction

 7   with regard to Trooper Splittgerber and her complaint

 8   about these examinations that we haven't discussed?

 9   Do you have any other interactions, actions taken,

10   anything like that, other than the information we've

11   discussed so far?  Any further involvement?

12        A.     Yes.

13        Q.     Okay.  And what was that?

14        A.     Once -- once I -- once I learned -- once

15   reports came back to me what the examination

16   procedure, whatever it's called, was for and that it

17   was complying with PSAC requirements, I asked if

18   there were any other way to perform the same

19   procedure with -- or with a personal physician,

20   either male or female.  For either male or female

21   candidates.

22        Q.     All right.  And was there a change after

23   Mrs. Splittgerber's complaints in who would perform

24   such examinations?

25        A.     We just made provisions -- excuse me.
```

RICE - Direct

1    The state patrol made provisions for a personal

2    physician to perform the same -- look for the same

3    qualifications, examination, whatever the correct

4    term is.

5         Q.    Okay.  So --

6         A.    Within six months of acceptance to the

7    academy.

8         Q.    So at that point if it had been in

9    effect, Trooper Splittgerber could have gone to her

10   personal gynecologist or whoever to have fill out

11   those forms?

12        A.    If it had been in effect, that's true.

13        Q.    All right.  But Trooper Splittgerber had

14   no choice about who to use when she went through the

15   examination; correct?

16             MS. FORCH:  Foundation.

17        A.    True.

18        Q.    (By Mr. White)  Now, the forms don't say

19   to the doctor how you should examine this patient for

20   hemorrhoids; correct?

21        A.    True.

22             MR. CREAGER:  If you know.

23        Q.    (By Mr. White)  You know, the forms don't

24   tell the physician you have to have them display

25   their anus, it just says you have to rule out

1    hemorrhoids; correct?

2         A.    That statement is true.

3         Q.    And the same is, the form doesn't say you

4    have to examine the vulva, labia, and parts of the

5    vagina in order to fill this out, it just says you

6    have to rule out urinary tract infections?

7              MR. CREAGER:  If you know.

8         A.    I -- I don't know the answer to that.

9         Q.    (By Mr. White)  Okay.  So you're not

10   familiar enough with what the form says?  I mean, you

11   can go look at the form if you want, and if you can

12   find in the form where it says the doctor has to

13   personally inspect the female's labia and vagina,

14   because I don't think it's there, but you go ahead.

15        A.    I don't think anywhere in the form it

16   tells a physician, whoever that is, what exact

17   procedures, examination, whatever, to perform or use.

18        Q.    Now, was Dr. Haudrich the only physician

19   actually performing these examinations when Trooper

20   Splittgerber was a candidate?

21        A.    I don't know.

22        Q.    Was Concentra the only healthcare

23   provider who the state patrol was using to provide

24   these -- or to perform these examinations when

25   Trooper Splittgerber was a candidate?

```
 1          A.    I don't know that either.
 2               MR. WHITE:  Can we take a break for a
 3     minute?  We're off the record.
 4                    (At this time a brief recess was
 5                    taken.)
 6               MR. WHITE:  Bob, we don't have any other
 7     questions.
 8               MR. CREAGER:  I'm going to go last, so
 9     anybody want to jump in here?
10               MR. ERNST:  Jessica?
11               MS. FORCH:  I have no questions.
12               MR. ERNST:  I just have a couple.
13                    CROSS-EXAMINATION
14     BY MR. ERNST:
15          Q.    Have you ever spoke to Dr. Haudrich
16     before today or met him before today?
17          A.    No.  No, sir.
18          Q.    And during your first -- I should ask,
19     did you have one meeting with Brienne or more than
20     one?
21          A.    One face to face.
22          Q.    Okay.  And during that first meeting with
23     her, did she bring with her the physical examination
24     form from her examination by Dr. Haudrich?
25          A.    No, sir.
```

1      Q.    So she didn't point anything out to you

2  during that meeting?

3      A.    No, sir.

4            MR. ERNST:  That's all I have.  Thank

5  you.

6                   CROSS-EXAMINATION

7  BY MR. CREAGER:

8      Q.    I just have a few questions, Colonel.

9  And what I'd like you to do is try to lay a timeline

10 over your testimony just to make sure that for now

11 and for future reference that -- that this testimony

12 subsequently used in the case, that things are in

13 context.  Okay?

14           The record evidence in this case shows

15 that the examination that the plaintiff complains of

16 occurred on September 11th, 2014.  You have no reason

17 to dispute that, do you?

18     A.    No, sir.

19     Q.    And were you associated with the state

20 patrol or not on the date the examination took place?

21     A.    I was not.

22     Q.    Okay.  And you testified that you later

23 were appointed to the role of superintendent.  Do you

24 remember the precise date you were sworn in to take

25 command?

RICE - Cross (Creager)                                    29

1          A.     It was March of '15.

2          Q.     So if we use March of 2015 as sort of

3    ground zero for your involvement in your capacity as

4    superintendent, how long after March of 2015 was it

5    that you became aware that Trooper Splittgerber had

6    any complaints about her September 11th, 2014,

7    examination?

8          A.     February of last year.  So it would be

9    February of '17.  Yeah.

10         Q.     And I believe your testimony was that she

11   either asked for or somehow scheduled a face-to-face

12   meeting with you?

13         A.     Correct.

14         Q.     And do you remember the date of that

15   face-to-face meeting or the approximate time?

16         A.     Well, it was in February of '17.  I can't

17   remember the exact date.  In the afternoon at the --

18   late -- late morning or early afternoon at the

19   training academy in Grand Island.

20         Q.     Okay.  And do you recall how that meeting

21   was set up?

22         A.     Trooper Splittgerber at the time asked

23   for a one-on-one meeting with myself.  I did not --

24   I -- the subject of the meeting was unknown at the

25   time.  She went through the proper chain of command,

1    the proper channels.  It was scheduled.  Since I was

2    at the training academy that day, I met her at the

3    training academy.

4        Q.    Okay.

5        A.    She was stationed in Kearney, I believe,

6    at the time.

7        Q.    Based upon your best recollection --

8        A.    Right.

9        Q.    -- sometime late in the day on --

10       A.    Or late -- late morning or very, very

11   early afternoon.  One of the two.

12       Q.    And this was February -- what day in

13   February, if you recall?

14       A.    I don't -- I have to look at the calendar

15   to see.

16       Q.    I think there's other evidence that

17   perhaps can nail that down.  But at least at this

18   meeting you're describing, was that the first time

19   you heard anything about Trooper Splittgerber's

20   complaint?

21       A.    Yes, sir.

22       Q.    So you hadn't become aware through the

23   chain of command or from your prior -- the prior

24   superintendent or anybody on your staff that there

25   was a complaint or there was a complaint being

1    investigated or anything like that?

2         A.    No, sir.

3         Q.    What do you recall Trooper Splittgerber

4    to have actually stated to you in her complaint?

5         A.    She -- this is going to be rough.  I

6    cannot --

7         Q.    To the best of your recollection.  And,

8    honestly, if you don't know, please say you don't

9    know.

10        A.    Right.

11        Q.    I don't want you to speculate or

12   conjecture on that.

13        A.    She just told me she had a concern with

14   the examination that she was required to submit to

15   as -- as a candidate for the state patrol.  And then

16   she described her recollection of the examination.

17        Q.    So see if I have this right.  That at the

18   time in February of 2017 when Trooper Splittgerber

19   met with you, she had obtained the assignment and was

20   sworn in as a trooper in the Nebraska State Patrol?

21        A.    That's correct.

22        Q.    Aside from complaining about the physical

23   she took a year and a half ago, did she have any

24   complaints that presently, that is at the time she

25   met with you, that she was being harassed or

1    discriminated against or felt that her job status as

2    a trooper was being affected by anything related to

3    her complaint?

4              MR. WHITE:  Objection.  Leading.  Calls

5    for legal conclusions.

6        Q.    (By Mr. Creager)  You can answer.

7              MR. WHITE:  Unless your counsel has

8    advised you of law school class on employment law, we

9    object.

10             MR. CREAGER:  You can object all you

11   want, Counsel.  His word is "complaint."  I'm not

12   talking about an EEOC complaint.  I'm talking about

13   did she complain about any of those things.

14             MR. WHITE:  Harassed, hostile are legal

15   terms and legally loaded, Counsel.

16             MR. CREAGER:  That's fine.  I can ask if

17   she --

18             MR. WHITE:  Objection.  Foundation.

19             MR. CREAGER:  So noted.

20       Q.    (By Mr. Creager)  Answer the question.

21       A.    No complaints.

22       Q.    Of any kind?

23       A.    Of any kind.

24       Q.    All right.  So the only complaint that

25   she had -- and I use "complaint" in the common

RICE - Cross (Creager)                                    33

1    vernacular -- was about the physical?

2         A.    Correct.

3         Q.    In response to her complaint, did you

4    take some action to investigate the status of that

5    complaint?

6         A.    I did.

7         Q.    What did you learn about the nature of

8    what the state patrol had done up to that point in

9    time in response to her complaint?

10        A.    I -- I was informed that she did call --

11   call the examination into question when she was at

12   the training academy.  That the -- the complaint went

13   up the chain of command through Captain Williams to

14   the administrative services major over to the

15   superintendent's office.  The superintendent's office

16   asked human resources to look into it.

17             They contacted Dr. Haudrich's office,

18   received an explanation of -- of what the examination

19   was for, and that answer was then transmitted back

20   down the chain of command to, at that time, candidate

21   Splittgerber.  She had a meeting -- my recollection,

22   what I was told -- with then Captain Williams.  And

23   it appeared that the matter, all the concerns, were

24   addressed and that was the last that any in the staff

25   at the state patrol had heard about it.

1    **Q.**    Now, this would have been sometime after

2   February of 2017 that you would have learned what you

3   just told us?

4    **A.**    That was the same day.  The same day as

5   the -- as the complaint that she -- when she gave --

6   when she voiced her concern to me, I called the

7   meeting of Lieutenant Colonel Schwarten,

8   Administrative Services Major Russell Stanczyk, Wendy

9   Wussow -- legal counsel Wendy Wussow -- and HR

10  administrator Jerry Lee Jensen.

11   **Q.**    Okay.  If you recall, did anybody produce

12  for you in your capacity as colonel and

13  superintendent at the Nebraska State Patrol either a

14  written report or any findings that would establish

15  that the state patrol had taken some official action

16  in response to her complaint?

17   **A.**    No.

18   **Q.**    Did you ever see any formal file, written

19  memorandums of an investigation or anything like

20  that, while you were superintendent?

21   **A.**    Of the original com- --

22   **Q.**    Of the original complaint.

23   **A.**    No.

24   **Q.**    All right.  Did you get back to Trooper

25  Splittgerber in response to her inquiry?

```
1          A.      Yes.

2          Q.      And when was that?

3          A.      Approximately 30 days later.

4    Approximately.

5          Q.      And why -- what was going on at the time

6    if you can recall that precipitated the response?

7          A.      I had -- I had instructed legal counsel

8    and Jerry Lee Jensen, HR director, to contact the --

9    the medical facility and just find out what was going

10   on, what it was for, so I could at least have some

11   knowledge and get -- and address Trooper

12   Splittgerber's concerns.  At that time, the first

13   time I contacted her again was to let her know that

14   it had not got lost and I was still looking into it

15   and I did not take her concern lightly.

16         Q.      Now, this concern that you were

17   addressing was the concern expressed to her -- to you

18   in a personal meeting in February of 2017; correct?

19         A.      That's true.

20         Q.      All right.  And she wasn't, to your

21   knowledge, facing any additional physical

22   examinations nor required to take any further medical

23   examinations; is that correct?

24         A.      That's correct.

25         Q.      So she was already a trooper at that
```

1    time?

2         A.    Yes, sir.

3         Q.    And I believe during direct examination,

4    the question posed to you, was she concerned about

5    the next class coming in and females that may be

6    subject to what she described as an improper

7    procedure?

8         A.    Yes.

9         Q.    Were there other things going on at the

10   state patrol at that time regarding investigations

11   that were being conducted, administrative

12   disciplinary matters, kind of put this investigation

13   of the Trooper Splittgerber incident with other

14   things that were going on at the time at the state

15   patrol affecting you?

16        A.    Yes.  There was always something going

17   on.

18        Q.    How long then after you told

19   Ms. Splittgerber about 30 days or so later that you

20   hadn't forgotten about it and you were working on it

21   that you heard some other response to the

22   investigation?  Poor question.  I'll strike it.

23             What was the next thing that you remember

24   happening?

25        A.    Around the 1st of May, I wanted to

1    contact Trooper Splittgerber by phone and give her an

2    update on where we were at, what was occurring with

3    it.  And I did.

4         Q.    Okay.  And -- all right.  Do you recall

5    where and when that conversation took place?

6         A.    I phoned her from, I believe, my

7    cellphone, my -- the patrol-issued cellphone in my

8    office at that time.

9         Q.    Can you recall the conversation, what was

10   said by you and what was said by Trooper Splittgerber

11   during that conversation?

12        A.    Yes.  I wanted to -- I wanted to talk to

13   her, but I was advised by legal counsel, Wendy

14   Wussow, that I should not talk to her if she was

15   engaging in a lawsuit either against the -- no.  Just

16   against the agency.  Agency at the time.  There was

17   rumor that she had filed a lawsuit.  Whether that was

18   an EEOC, I didn't -- I did not know at the time.  It

19   was unknown.

20        Q.    Just to make sure that we have the

21   timeline correct, in this period after the 30 days

22   when you told her that you hadn't forgotten about it,

23   had you also been in contact with people of the state

24   patrol -- Wendy Wussow, Captain Stanczyk and

25   others -- about the continuing investigation?

1          A.      Yes.

2          Q.      So that was an ongoing thing?

3          A.      Yes, sir.

4          Q.      But the question that I put out there

5    was, what do you remember next about contacting her,

6    and you said there was a cellphone call; right?

7          A.      Correct.

8          Q.      And do I understand you to say that

9    before you made that call, you had been instructed by

10   legal counsel that if she had a lawyer, you shouldn't

11   talk to her?

12         A.      Correct.

13         Q.      All right.  So why'd you call her?

14         A.      I felt it was a matter of -- my

15   responsibility as a superintendent.  A trooper had

16   raised a concern, a question.  I did not want to

17   ignore it.  I wanted to get back with one of my --

18   one of my troopers and let them know that this had

19   not got lost in the shuffle and that I was concerned.

20   I mean, I took -- I did not know -- I'll just leave

21   it at that.

22         Q.      So at least -- I'm trying to establish

23   your state of mind at the time.  You had some

24   indication from counsel that maybe you shouldn't talk

25   to her, but maybe she didn't file, maybe she did

1    file, maybe she had an attorney, maybe she didn't

2    have an attorney.  You didn't know the answer to any

3    of those questions?

4         A.    Correct.

5         Q.    All right.  So you called her, and what

6    was the conversation, if you can recall?

7         A.    I asked -- I asked Wendy Wussow, my

8    attorney, legal counsel, that if I called her, if it

9    would be okay to just ask her if she had an attorney

10   representing her in this.  And if she did, that I

11   would just let her know that I couldn't talk to her,

12   we'd have to go through attorney to attorney.  But if

13   she didn't, that I would be happy to discuss with

14   her, you know, where we were at and that it -- we

15   were still looking into it, it just hadn't gotten

16   lost.

17        Q.    So what did she say about that?

18        A.    She told me on the phone that she did not

19   have an attorney yet, but she was contemplating

20   getting one.

21        Q.    So based on that answer, then did you

22   have a further conversation with her about what the

23   status was of the investigation?

24        A.    Yes.

25        Q.    All right.  And what did you inform her?

1      A.    I just in- -- I informed her that we were

2  going to maybe develop some different protocols and

3  allow for some different ways to accomplish the same

4  mission.  I don't -- and I did not -- I don't

5  remember being very specific with her on that.

6      Q.    All right.  So did that conversation

7  result in any conclusion, or was it just an exchange

8  of information?

9      A.    She just -- we concluded the

10 conversation.  She -- she told me she appreciated the

11 call and she appreciated that I was paying attention

12 to her.

13     Q.    Did you have any further conversations or

14 communications or correspondence of any kind with

15 Trooper Splittgerber after that phone call?

16     A.    No.  I do not believe so, no.

17     Q.    Now, what's the next thing you remember

18 about the investigation or being involved in -- in

19 the investigation?

20     A.    I -- I'd have to look at the timeline,

21 but I think it was maybe a week or a week and a half

22 later that the agency received notification that she

23 had filed an EEOC --

24     Q.    Okay.

25     A.    -- complaint.

1      Q.      And, now, you testified earlier that this

2    wasn't the only thing going on at the state patrol.

3    There were numerous other matters pending at the

4    time.  Were you also attending to those matters?

5      A.      Yes.

6      Q.      And from that last conversation in which

7    you learned about the EEOC complaint, did you have

8    any further involvement in the investigation?

9      A.      No.

10     Q.      And you eventually were dismissed as

11   superintendent by the governor; is that correct?

12     A.      That's correct.

13     Q.      And when did that occur?

14     A.      June 30th.

15     Q.      Okay.  And then after that, complaints

16   and lawsuits, and you've learned a lot about the case

17   through discovery and things of that nature since

18   then; correct?

19     A.      That's correct.

20     Q.      What I want to do is circle back and get

21   to this alphabet soup agency and try to find out a

22   little bit about what you can tell us about the role

23   the state patrol has, if any, in the formulation of

24   the guidelines for the medical examination.  Okay?

25   You and counsel immediately started exchanging

1    information about some sort of agency that sets the

2    standards for something related to law enforcement?

3         A.    Yes.

4         Q.    And -- and what is that agency?

5         A.    That's the Police Standards Advisory

6    Council, which is kind of a subset of the Crime

7    Commission.

8         Q.    So these -- what's your -- what's your

9    knowledge about the nature of that commission?

10        A.    The commission -- in this instance, the

11   commission just sets the standards, sets the physical

12   standards, for all certified police -- to become a

13   certified police officer in the state of Nebraska.

14        Q.    To your knowledge, does that commission

15   have anything to do with the Nebraska State Patrol as

16   an administrative agency of the state of Nebraska?

17        A.    No.

18        Q.    Do you have -- as superintendent of the

19   Nebraska State Patrol, do you, to your knowledge,

20   have any jurisdiction over that agen- -- over that

21   commission?

22        A.    No, sir.

23        Q.    Can you tell it what to do?

24        A.    No.

25        Q.    Could you in your capacity as

1    superintendent of the Nebraska State Patrol change

2    the guidelines set forth on the medical examination

3    form?

4         A.    No.

5         Q.    Could you make recommendations for

6    changes?

7         A.    Yes.

8         Q.    Did you make any recommendations for

9    changes in either the procedure or the -- the manner

10   in which the examinations were conducted?

11        A.    No.  Not to the Crime Commission or

12   Police Standards Advisory board.

13        Q.    So when you testified that you

14   recommended a change be in who conducted the

15   examination, did you think that recommendation was

16   consistent with your powers and duties as

17   superintendent?

18        A.    Yes.

19        Q.    Just to clarify some general allegations,

20   Colonel, were you engaged in any agreement with any

21   other investigators or members of the state patrol to

22   cover up Trooper Splittgerber's complaints?

23        A.    No.

24        Q.    Were you engaged in any agreement with

25   any others in the Nebraska State Patrol or with any

1    other party to cover up sexual assaults of female

2    candidates who had made applications for the -- to be

3    sworn officers to the Nebraska State Patrol?

4         A.    No.

5         Q.    Do you have any medical training?

6         A.    None.

7         Q.    Did you have any information that

8    resulted from the investigation that suggested to you

9    as superintendent of the Nebraska State Patrol that

10   there was anything improper about the manner or

11   method in which the state patrol conducted physical

12   examinations of female candidates?

13             MR. WHITE:  Objection.  Form, foundation.

14   The state patrol didn't conduct them.

15        A.    No.

16             MR. CREAGER:  That is correct.

17             MR. WHITE:  They did require them.

18             MR. CREAGER:  That's both correct.  But

19   the lawsuit is against my client because he was

20   superintendent of the state patrol.  So we'll ask it

21   both ways.

22        Q.    (By Mr. Creager)  Did you have any reason

23   to believe that the state Crime Commission and the

24   procedures that they outline for the conducting of

25   medical examinations for female troopers at the

1    academy were medically unnecessary?

2        A.    No.

3        Q.    Based upon what you knew at the time,

4    starting with the complaint by Trooper Splittgerber

5    in February '17, did you fully and properly

6    investigate her allegations to the best of your

7    knowledge and belief?

8        A.    Yes.

9        Q.    When you were relieved of command, do you

10   know what the status of the Splittgerber

11   investigation was at that time?  I just want to --

12   I'm just trying to give you a chance between the time

13   of the last communication and then the time that you

14   were relieved of command, is there anything else you

15   learned about the investigation that you haven't told

16   us about before you left command?

17       A.    No.

18            MR. CREAGER:  I have no further

19   questions.  Thank you, sir.

20            MR. WHITE:  I have a couple of

21   follow-ups.

22                   REDIRECT EXAMINATION

23   BY MR. WHITE:

24       Q.    You mentioned a timeline.  Did you

25   prepare a timeline?  Did you prepare a timeline --

RICE - Redirect

```
 1          A.     Did I --
 2          Q.     -- of the events in this case?  You
 3     mentioned, "I'd have to review the timeline."
 4          A.     Well, no.  I'd have to look at -- I'd
 5     have to look at the records of the state patrol.
 6          Q.     Okay.  Did you review a timeline in order
 7     to come in and testify today?
 8          A.     Just -- just this.  What you have.
 9          Q.     And that document would be the petition
10     or the --
11          A.     Motion to dismiss and --
12          Q.     All right.
13          A.     -- the complaint for -- and demand for
14     jury.
15          Q.     So just legal pleadings, is all you
16     reviewed?
17          A.     Yeah.
18          Q.     Now, you were -- are a trained criminal
19     investigator; correct?
20          A.     Yes.
21          Q.     And you spent years investigating crimes;
22     correct?
23          A.     Let's back up.  The -- investigating
24     crimes is part of the duties of the state patrol.
25          Q.     Understood.
```

RICE - Redirect

1      A.    I was never an investigator.  I was

2   always in the uniformed division.  So specific

3   training for specific crimes, no.

4      Q.    All right.  As a part of the troopers,

5   did you ever interview people who -- to see if they

6   were involved in any illegal act?

7      A.    Yes.

8      Q.    And when you would ask them a question

9   and you would find out subsequently they had lied to

10  you about an important fact, did that change the way

11  you looked at that conversation?

12     A.    Yes.

13     Q.    So when false information is given to a

14  law enforcement officer by -- on an investigation, is

15  that considered a red flag?

16     A.    Yes.

17     Q.    Now, you talked personally to Trooper

18  Splittgerber in March; correct?

19     A.    I believe it was February.

20     Q.    February 2017.  And then you had a

21  follow-up on May 1st, 2017, where you called on the

22  phone and she indicated she might be filing an EEOC

23  complaint; correct?  Or was contemplating it?

24     A.    Yes.

25     Q.    Now, were you aware that in between those

RICE - Redirect

```
 1    two times, on March 31, 2017, Trooper Splittgerber
 2    received an e-mail saying the reason for this
 3    invasive examination was to look for a hernia?
 4              MR. ERNST:  Object to the form.
 5         Q.    (By Mr. White)  Were you aware of that
 6    timing?
 7              MR. CREAGER:  Asked and answered, too.
 8              MR. WHITE:  Just because it hurts doesn't
 9    mean I don't get to talk about it.
10              MR. CREAGER:  There's nothing to hurt
11    there, my friend.
12         Q.    (By Mr. White)  Well, I'm asking you --
13         A.    Was I aware of what?
14         Q.    Okay.  First you talked to Trooper
15    Splittgerber personally?
16         A.    I think you asked me two questions there.
17         Q.    Well, let me rephrase them.
18         A.    Okay.
19         Q.    Okay.  And we'll play it politely.
20    Splittgerber talks to you personally; correct?
21         A.    Yes, sir.
22         Q.    All right.  And that's in February;
23    correct?
24         A.    Yes, sir.
25         Q.    Of 2017?
```

```
 1            A.    Yes, sir.
 2            Q.    All right.  And you're the colonel in
 3     charge at that time; correct?
 4            A.    Yes, sir.
 5            Q.    Then you talk to her again on the phone;
 6     correct?
 7            A.    Yes, sir.
 8            Q.    In May; correct?
 9            A.    Yes, sir.
10            Q.    Were you aware that in between those two
11     conversations, Trooper Splittgerber received an
12     e-mail from attorney Wussow saying the explanation
13     for the nature of the exam you received was to look
14     for a hernia?
15            A.    Yes.
16            Q.    And you now know that to be a false --
17     that that is false, that wasn't allegedly even the
18     reason for the exam?
19                  MR. CREAGER:  I'm going to object.  Your
20     timeline is wrong, Counsel.
21                  MR. WHITE:  No.  It's right, Counsel.
22                  MR. CREAGER:  It's wrong, Counsel.  And
23     you're confusing the witness.  He's already answered
24     this question that he didn't know it at the time,
25     that he learned about it through discovery.
```

RICE - Redirect

1              MR. WHITE:  Counsel, next time we go to

2      the judge.

3              MR. CREAGER:  All right.  That's fine.

4      I'm all for it.

5         Q.    (By Mr. White)  Simple question.  Do you

6      know when you spoke to Splittgerber personally?  What

7      time on -- the personal interview about this, when

8      was it?

9         A.    Okay.  Do I know that the -- do I know --

10        Q.    No, no.  Just the question.  Are you

11     aware what time generally you interviewed Trooper

12     Splittgerber personally?  Yes or no.

13        A.    Yes.

14        Q.    When was that?

15        A.    February.

16        Q.    Are you aware of what time you spoke to

17     Trooper Splittgerber on the cellphone?  Yes or no.

18        A.    Yes.

19        Q.    And when was that?

20        A.    May.  Same year.

21        Q.    Are you aware of when attorney Wussow

22     sent an e-mail to Splittgerber explaining -- or

23     Splittgerber's association attorney explaining the

24     reason for the examination?

25        A.    Yes.

```
 1          Q.      And when was that?

 2          A.      When the e-mail was sent?

 3          Q.      Yes.

 4          A.      It -- it was in between February and May.

 5          Q.      Are you aware what the e-mail contained?

 6   Yes or no.

 7                  MR. CREAGER:  I'm going to object --

 8                  MR. WHITE:  Bob, just settle down.  We're

 9   doing this this way because of you --

10                  MR. CREAGER:  Yeah, that's right.

11                  MR. WHITE:  -- confusing the issue.  So

12   I'm going to make the timeline right.  Now the

13   timeline is right.

14                  MR. CREAGER:  I get to make my objection.

15                  MR. WHITE:  Then make an objection.

16                  MR. CREAGER:  I'll make my objection.

17   Form, foundation, assumes facts not in evidence.

18   It's inconsistent with his testimony.  The question

19   asked are you aware.  Not when --

20                  MR. WHITE:  Now you're coaching, Bob.

21   You're not objecting.

22                  MR. CREAGER:  Then I'll -- then I'll send

23   you out of the room.

24                  Listen carefully to what he's saying,

25   because the questions are not sequential.  So if you
```

1    know, answer the questions.

2              MR. WHITE:  Jesus, you ought to be

3    ashamed.

4         Q.    (By Mr. White)  So as you remember it,

5    interview with Splittgerber, letter -- or e-mail from

6    Wussow to Splittgerber's attorney, phone call with

7    Splittgerber; is that correct?

8         A.    That's correct.

9         Q.    Okay.  That's the timeline.  Now, were

10   you aware at the time of your main conversation with

11   Trooper Splittgerber that she had been told by

12   attorney Wussow that the reason for the examination

13   was to find out if she had a hernia?

14        A.    Yes.

15        Q.    Were you aware at that time that that was

16   not accurate, that was not a legitimate reason for

17   the examination?

18        A.    No.

19        Q.    When did you learn that?

20        A.    I -- I think I mentioned it just a minute

21   ago, and you said not to discuss it.

22        Q.    Oh, from your attorney.  I'm sorry.

23        A.    Yes.

24        Q.    Yes.  Then we'll leave that.  All right.

25   Did Trooper Splittgerber advise you why she was

1    thinking about filing an EEOC complaint in that
2    conversation?
3         A.    No.
4         Q.    You'd mentioned that you had not dropped
5    the ball; correct?
6         A.    Correct.
7         Q.    And at that point in time, you believed
8    attorney Wussow's explanation for why the examination
9    was to look for a hernia?
10        A.    Yes.
11        Q.    Was there any other follow-up
12   investigation to your knowledge as to why attorney
13   Wussow would say it was for a hernia?
14        A.    Okay.  I'm sorry.  Say it again.
15        Q.    Okay.  Did you at any time while you were
16   colonel have any follow-up investigation as to why
17   attorney Wussow would provide information that wasn't
18   accurate as an explanation for the nature of the
19   examination undergone by Trooper Splittgerber?
20        A.    Well, the answer to your question is no.
21        Q.    Okay.  Thank you.
22        A.    Okay.
23        Q.    And were you aware of any other
24   complaints Splittgerber had made through the chain of
25   command after receiving Wussow's explanation for the

```
 1    examination that, in fact, that was not an accurate
 2    explanation?
 3          A.    No.
 4                MR. WHITE:  Those are the questions we
 5    have.
 6                MR. ERNST:  I have a few more.
 7                     RECROSS-EXAMINATION
 8    BY MR. ERNST:
 9          Q.    I was unclear when you talked about --
10    I'm unclear whether you made a recommendation or you
11    simply asked if it would be possible for trooper
12    candidates to have their own personal physician do
13    this examination?  Was that a recommendation, or did
14    you just inquire about it?
15          A.    I was asking.
16          Q.    And who were you asking?
17          A.    My staff.
18          Q.    Okay.  And did you get an answer?
19          A.    Yes.
20          Q.    What was the answer?
21          A.    The answer was, a personal physician
22    could accomplish the same thing if -- if it was done
23    within six months prior to accepting -- prior to the
24    first day of the academy.
25          Q.    And then was that new procedure put into
```

1    play, if you know?

2            A.      It was.

3            Q.      Okay.  So currently they can do that?

4            A.      As far as I know.

5            Q.      As far as you know.  Okay.  All right.

6    And then I had a couple questions about this meeting.

7    I think I heard you say that the same day that you

8    learned about the plaintiff's complaint, you had a

9    meeting with Colonel Schwarten, Russell Stanczyk,

10   Wendy Wussow, and Jerry Lee Jensen.  Did I understand

11   that correctly?

12           A.      That's true.  And I -- I know that I

13   talked to Lieutenant Colonel Schwarten.  That meeting

14   either occurred that afternoon or the very next day.

15   And I cannot exactly remember, but it was immediately

16   after the meeting with Brienne.

17           Q.      Okay.  And why were those four particular

18   people asked to be in the meeting?

19           A.      That would be their bailiwick.  The

20   administrative services major is in charge of the

21   training academy.  They -- and when the candidates

22   come -- when the candidates are accepted, of course

23   they go -- that's their first chain of command, is

24   the training academy.

25               Human resources sets up all -- or assists

1    in setting up all of the necessary procedures to get

2    somebody into the training academy:  recruiting,

3    et cetera.  And then obviously legal counsel needed

4    to be involved

5         Q.    Okay.

6         A.    And the administrative services major is

7    in charge of all of that side of the house --

8         Q.    Okay.

9         A.    -- with the exception of legal services.

10        Q.    And I think I heard you say that it was

11   at that meeting that somebody said that there had

12   been a conversation with somebody from Concentra that

13   had happened previously?

14        A.    Yes.

15        Q.    And who said that, do you remember?

16        A.    I don't recall.

17        Q.    And did they say it was a phone

18   conversation or a meeting?

19        A.    I -- I cannot say.  I don't recall.

20        Q.    Did anyone say who at Concentra

21   supposedly participated in this conversation or

22   meeting?

23        A.    I cannot -- no.  I do not know.

24        Q.    All right.  And there was never a report,

25   you never saw an e-mail, a letter, any sort of

1    documentation that that actually happened; is that
2    correct?
3          A.    That's true.
4          Q.    All right.  Do you know why there was no
5    documentation of it?
6          A.    I do not.
7          Q.    And this e-mail that was sent by
8    Ms. Wussow to Gary Young, March 31, 2017, you've seen
9    that before today; correct?
10          A.    Yes, sir.
11          Q.    It says, quote, According to Brenda
12    Urbanek, the requirement for the PSAC regulation form
13    is for a hernia check which is for both males and
14    females, unquote.
15                Did you ever have a conversation with
16    Brenda Urbanek about how she came to that
17    understanding?
18          A.    I did not.
19          Q.    Do you know if anyone did?
20          A.    I do not know.
21          Q.    Okay.  Have you ever talked with Wendy
22    Wussow about that, about how Brenda Urbanek
23    reportedly came up with hernia check as being the
24    requirement under the PSAC regulation?
25          A.    No.

1                  MR. ERNST:  Thank you.  Those are all the

2      questions.

3                  MS. FORCH:  Dave covered mine, so I'm

4      good.  No questions.

5                  MR. CREAGER:  Nothing further.  Okay.  If

6      we're all done, I'll tell you about your right to

7      read and sign the deposition.  One of the privileges

8      you get, if you wish to assert your right, is that

9      after the court reporter types this all up, you can

10     get together with her and go through the transcript

11     for the purposes of making sure that she got down

12     what you said correctly.  And not for the purpose of

13     changing your answers or modifying anything, but if

14     you think you remember something differently than she

15     put down, you can make a note of that and kind of

16     work that out later, or you can waive that, which

17     would allow her to transcribe, type that up, and have

18     us use this without your actual signature.

19                 It is your privilege.  No one can make

20     you read it, no one can make you sign it.  It is my

21     experience the court reporters pretty much get it

22     right, so if you want to waive that right, that's

23     fine with me.  But you just need to let her know.

24                 THE WITNESS:  I'll waive.

25        (Deposition concluded at 10:12 a.m.)

C E R T I F I C A T E

I, Marcy Benge, RMR, General Notary Public, duly commissioned, qualified, and acting under a general notarial commission within and for the State of Nebraska, do hereby certify that:

**BRADLEY RICE**

was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken by me at the time and place herein specified and in accordance with the within stipulations; that I am not counsel, attorney, or relative of either party or otherwise interested in the event of this suit.

IN TESTIMONY WHEREOF, I have hereunto set my hand officially and attached my notarial seal at Lincoln, Nebraska, this 18th day of September, 2018.





43:12
**affected** [1] - 32:2
**affecting** [1] - 36:15
**afternoon** [4] - 29:17; 30:11; 55:14
**age** [1] - 5:2
**agen** [1] - 42:20
**agency** [7] - 37:16; 40:22; 41:21; 42:1, 4, 16
**ago** [4] - 9:1, 11; 31:23; 52:21
**agreement** [2] - 43:20, 24
**ahead** [2] - 10:8; 26:14
**allegations** [2] - 43:19; 45:6
**allegedly** [1] - 49:17
**allow** [2] - 40:3; 58:17
**alphabet** [1] - 41:21
**anatomy** [1] - 19:10
**answer** [14] - 10:9; 11:11, 14; 20:5; 26:8; 32:6; 33:19; 39:2, 21; 52:1; 53:20; 54:18, 20
**Answer** [1] - 32:20
**answered** [3] - 12:8; 48:7; 49:23
**answers** [1] - 58:13
**anus** [6] - 6:16; 9:8, 10; 19:22; 23:2; 25:25
**appeared** [1] - 33:23
**applications** [1] - 44:2
**appointed** [2] - 5:23; 28:23
**appreciated** [2] - 8:10; 40:10
**appropriate** [2] - 11:23; 15:18
**approximate** [1] - 29:15
**areas** [1] - 7:10
**ashamed** [1] - 52:3
**aside** [1] - 31:22
**assaults** [1] - 44:1
**assert** [1] - 58:8
**assignment** [2] - 18:25; 31:19
**assists** [1] - 55:25
**associated** [1] - 28:19
**Association** [1] - 17:10
**association** [2] - 22:13; 50:23
**assume** [1] - 18:17
**assumes** [2] - 11:3; 51:17
**attending** [2] - 16:23; 41:4
**attention** [1] - 40:11
**attorney** [22] - 13:13; 14:18, 22; 19:20; 20:18; 39:1, 8-9, 12, 19; 49:12; 50:21, 23; 52:6, 12, 22; 53:8, 12, 17
**authority** [1] - 27:4
**aware** [28] - 6:1, 17; 7:2, 4, 11, 14; 8:3; 21:17; 22:22, 24; 23:7, 16, 21-22; 29:5;

**'15** [2] - 5:24; 29:1
**'17** [4] - 5:25; 29:9, 16; 45:5

# 1
**10:12** [1] - 58:25
**11th** [2] - 28:16; 29:6
**1981** [1] - 5:21
**1st** [2] - 36:25; 47:21

# 2
**2011** [1] - 5:22
**2014** [2] - 28:16; 29:6
**2015** [2] - 29:2, 4
**2017** [8] - 31:18; 34:2; 35:18; 47:20; 48:1, 25; 57:8

# 3
**30** [3] - 35:3; 36:19; 37:21
**30th** [1] - 41:14
**31** [2] - 48:1; 57:8

# 4
**40** [2] - 9:1, 11

# A
**a.m** [1] - 58:25
**absolutely** [2] - 12:4; 18:9
**academy** [12] - 16:23; 17:2; 25:7; 29:19; 30:2; 33:12; 45:1; 54:24; 55:21, 24; 56:2
**acceptance** [1] - 25:6
**accepted** [2] - 19:2; 55:22
**accepting** [1] - 54:23
**accomplish** [3] - 15:12; 40:3; 54:22
**According** [1] - 57:11
**accurate** [5] - 17:14; 20:20; 52:16; 53:18; 54:1
**act** [1] - 47:6
**action** [2] - 33:4; 34:15
**actions** [1] - 24:9
**actual** [2] - 16:6; 58:18
**additional** [1] - 35:21
**address** [1] - 35:11
**addressed** [1] - 33:24
**addressing** [1] - 35:17
**administrative** [5] - 33:14; 36:11; 42:16; 55:20; 56:6
**Administrative** [1] - 34:8
**administrator** [1] - 34:10
**advise** [1] - 52:25
**advised** [4] - 18:1; 20:1; 32:8; 37:13
**Advisory** [3] - 22:14; 42:5;

30:22; 47:25; 48:5, 13; 49:10; 50:11, 16, 21; 51:5, 19; 52:10, 15; 53:23

# B
**bailiwick** [1] - 55:19
**ball** [1] - 53:5
**based** [3] - 30:7; 39:21; 45:3
**became** [4] - 17:23; 23:21; 29:5
**become** [7] - 6:1, 10; 8:2; 10:24; 30:22; 42:12
**becoming** [1] - 11:24
**beginning** [3] - 5:19; 10:11
**behalf** [1] - 15:15
**belief** [1] - 45:7
**best** [4] - 16:25; 30:7; 31:7; 45:6
**between** [4] - 45:12; 47:25; 49:10; 51:4
**bit** [1] - 41:22
**board** [1] - 43:12
**bob** [2] - 27:6; 51:8
**Bob** [4] - 11:5; 12:11; 13:1; 51:20
**bowel** [1] - 23:1
**BRADLEY** [1] - 5:1
**Bradley** [1] - 5:13
**break** [1] - 27:2
**Brenda** [3] - 57:11, 16, 22
**brief** [1] - 27:4
**briefings** [3] - 13:23, 25; 14:1
**Brienne** [3] - 7:5; 27:19; 55:16
**bring** [1] - 27:23
**buttocks** [3] - 9:7, 17; 10:4
**BY** [5] - 5:11; 27:14; 28:7; 45:23; 54:8

# C
**calendar** [1] - 30:14
**candidate** [8] - 7:18; 8:4, 17; 22:21; 26:20, 25; 31:15; 33:20
**candidates** [13] - 6:22; 7:9; 8:12; 10:1, 24; 11:23; 18:3; 24:21; 44:2, 12; 54:12; 55:21
**cannot** [4] - 31:6; 55:15; 56:19, 23
**capacity** [3] - 29:3; 34:12; 42:25
**Captain** [4] - 17:1; 33:13, 22; 37:24
**captain** [1] - 5:22
**carefully** [2] - 13:6; 51:24
**case** [5] - 22:25; 28:12, 14; 41:16; 46:2

**cautioned** [1] - 5:2
**cellphone** [4] - 37:7; 38:6; 50:17
**certified** [3] - 5:3; 42:12
**cetera** [1] - 56:3
**chain** [8] - 16:22, 24; 29:25; 30:23; 33:13, 20; 53:24; 55:23
**chance** [1] - 45:12
**change** [4] - 24:22; 43:1, 14; 47:10
**changes** [2] - 43:6, 9
**changing** [1] - 58:13
**channels** [1] - 30:1
**charge** [6] - 9:24; 17:2; 49:3; 55:20; 56:7
**check** [6] - 14:21; 15:8, 15; 20:19; 57:13, 23
**checked** [1] - 7:11
**checklist** [1] - 8:3
**choice** [1] - 25:14
**circle** [1] - 41:20
**claim** [1] - 6:2
**clarify** [1] - 43:19
**class** [4] - 18:12, 16; 32:8; 36:5
**client** [1] - 44:19
**coaching** [1] - 51:20
**Colonel** [5] - 28:8; 34:7; 43:20; 55:9, 13
**colonel** [11] - 9:24; 11:21; 12:12; 17:6, 23; 20:6; 21:18, 21; 34:12; 49:2; 53:16
**com** [1] - 34:21
**coming** [1] - 36:5
**command** [12] - 16:22, 24; 28:25; 29:25; 30:23; 33:13, 20; 45:9, 14, 16; 53:25; 55:23
**Commission** [3] - 42:7; 43:11; 44:23
**commission** [5] - 42:9-11, 14, 21
**common** [1] - 32:25
**communication** [1] - 45:13
**communications** [1] - 40:14
**complain** [1] - 32:13
**complaining** [1] - 31:22
**complains** [1] - 28:15
**complaint** [24] - 24:7; 30:20, 25; 31:4; 32:3, 11-12, 24-25; 33:3, 5, 9, 12; 34:5, 16, 22; 40:25; 41:7; 45:4; 46:13; 47:23; 53:1; 55:8
**complaints** [11] - 6:8; 7:14; 8:14; 13:16; 24:23; 29:6; 31:24; 32:21; 41:15; 43:22; 53:24
**compliant** [1] - 22:17

**complying** [1] - 24:17
**Concentra** [4] - 15:17; 26:22; 56:12, 20
**concern** [9] - 7:11; 20:7, 10; 31:13; 34:6; 35:15-17; 38:16
**concerned** [2] - 36:4; 38:19
**concerns** [12] - 6:7; 16:11, 17, 21; 17:14, 17, 24; 18:2; 22:20; 23:22; 33:23; 35:12
**concluded** [2] - 40:9; 58:25
**conclusion** [1] - 40:7
**conclusions** [1] - 32:5
**conduct** [1] - 44:14
**conducted** [6] - 11:18; 19:17; 36:11; 43:10, 14; 44:11
**conducting** [1] - 44:24
**confusing** [2] - 49:23; 51:11
**conjecture** [1] - 31:12
**considered** [1] - 47:15
**consistent** [3] - 18:19; 19:2; 43:16
**contact** [3] - 35:8; 37:1, 23
**contacted** [2] - 33:17; 35:13
**contacting** [1] - 38:5
**contained** [1] - 51:5
**contemplating** [2] - 39:19; 47:23
**context** [1] - 28:13
**continuing** [1] - 37:25
**conversation** [15] - 37:5, 9, 11; 39:6, 22; 40:6, 10; 41:6; 47:11; 52:10; 53:2; 56:12, 18, 21; 57:15
**conversations** [2] - 40:13; 49:11
**correct** [41] - 11:18; 20:23; 21:24; 22:18; 25:3, 15, 20; 26:1; 29:13; 31:21; 33:2; 35:18, 23-24; 37:21; 38:7, 12; 39:4; 41:11, 18-19; 44:16, 18; 46:19, 22; 47:18, 23; 48:20, 23; 49:3, 6, 8; 52:7; 53:5; 57:2, 9
**correctly** [2] - 55:11; 58:12
**correspondence** [1] - 40:14
**Council** [2] - 22:14; 42:6
**counsel** [13] - 18:25; 19:8; 21:13; 32:7; 34:9; 35:7; 37:13; 38:10, 24; 39:8; 41:25; 50:1; 56:3
**Counsel** [5] - 32:11, 15; 49:20
**couple** [3] - 27:12; 45:20; 55:6
**course** [3] - 11:10; 16:3; 55:22
**court** [2] - 58:9, 21
**COURT** [1] - 10:15

**cover** [2] - 43:22; 44:1
**covered** [1] - 58:3
**CREAGER** [38] - 7:19, 23; 10:7; 11:2, 7, 12; 12:5, 14, 17, 21; 13:2, 5; 14:8; 17:19; 19:24; 20:4, 14; 25:22; 26:7; 27:8; 28:7; 32:10, 16, 19; 44:16, 18; 45:18; 48:7, 10; 49:19, 22; 50:3; 51:7, 10, 14, 16, 22; 58:5
**Creager** [3] - 32:6, 20; 44:22
**create** [1] - 8:3
**Crime** [2] - 42:6; 43:11; 44:23
**crimes** [3] - 46:21, 24; 47:3
**criminal** [1] - 46:18
**CROSS** [2] - 27:13; 28:6
**CROSS-EXAMINATION** [2] - 27:13; 28:6

## D

**date** [4] - 28:20, 24; 29:14, 17
**Dave** [1] - 58:3
**David** [1] - 14:10
**days** [3] - 35:3; 36:19; 37:21
**delegating** [1] - 23:23
**demand** [1] - 46:13
**department** [1] - 15:10
**deposition** [1] - 58:7
**Deposition** [1] - 58:25
**describe** [1] - 14:20
**described** [2] - 31:16; 36:6
**describing** [1] - 30:18
**detect** [1] - 19:22
**determinations** [1] - 11:17
**determine** [1] - 19:11
**develop** [1] - 40:2
**different** [5] - 7:23; 8:23; 12:7; 40:2
**differently** [1] - 58:14
**difficult** [2] - 8:5, 9
**DIRECT** [1] - 5:10
**direct** [1] - 36:3
**director** [4] - 13:14; 14:19; 23:25; 35:8
**disciplinary** [1] - 36:12
**discover** [1] - 18:24
**discovery** [2] - 41:17; 49:25
**discriminated** [1] - 32:1
**discuss** [2] - 39:13; 52:21
**discussed** [2] - 24:8, 11
**discussion** [1] - 5:9
**diseases** [1] - 23:6
**dismiss** [1] - 46:11
**dismissed** [2] - 5:24; 41:10
**display** [5] - 6:15; 9:8, 10; 10:5; 25:24

**dispute** [1] - 28:17
**division** [1] - 47:2
**doctor** [4] - 6:12; 25:19; 26:12
**doctors** [1] - 11:22; 19:4
**document** [1] - 46:9
**documentation** [2] - 57:1, 5
**documents** [1] - 14:4
**done** [3] - 33:8; 54:22; 58:6
**double** [1] - 7:2
**down** [6] - 15:7; 30:17; 33:20; 51:8; 58:11, 15
**Dr** [14] - 14:2, 17; 15:1, 7, 17, 22; 16:2; 18:4, 19; 21:8; 26:18; 27:15, 24; 33:17
**dropped** [1] - 53:4
**duly** [1] - 5:2
**during** [7] - 8:1; 23:17; 27:18, 22; 28:2; 36:3; 37:11
**duties** [2] - 43:16; 46:24

## E

**e-mail** [8] - 48:2; 49:12; 50:22; 51:2, 5; 52:5; 56:25; 57:7
**early** [2] - 29:18; 30:11
**EEOC** [6] - 32:12; 37:18; 40:23; 41:7; 47:22; 53:1
**effect** [4] - 18:10; 22:4; 25:9, 12
**either** [8] - 24:20; 27:1; 29:11; 34:13; 37:15; 43:9; 55:14
**employ** [1] - 21:24
**employed** [5] - 5:15; 6:21; 15:18; 16:1; 18:4
**employer** [1] - 15:17
**employment** [3] - 6:4; 8:2; 32:8
**encountered** [1] - 15:21
**end** [1] - 5:22
**endorse** [1] - 10:25
**enforcement** [2] - 42:2; 47:14
**engage** [1] - 6:14
**engaged** [3] - 18:21; 43:20, 24
**engaging** [1] - 37:15
**ERNST** [16] - 10:6; 11:1; 14:7; 19:18; 20:3, 11; 21:2, 9; 27:10, 12, 14; 28:4; 48:4; 54:6, 8; 58:1
**establish** [3] - 12:9; 34:14; 38:22
**et** [1] - 56:3
**evaluate** [1] - 16:7
**events** [1] - 46:2
**eventually** [1] - 41:10

**evidence** [3] - 28:14; 30:16; 51:17
**exact** [2] - 26:16; 29:17
**exactly** [2] - 9:19; 55:15
**exam** [3] - 10:3; 49:13, 18
**examination** [43] - 6:13, 18; 7:10; 8:4; 9:6; 10:23; 15:3, 22; 16:3, 7, 12; 18:4, 17; 19:9; 20:9; 21:7, 19; 23:17; 24:15; 25:3, 15; 26:17; 27:23; 28:15, 20; 29:7; 31:14, 16; 33:11, 18; 36:3; 41:24; 43:2, 15; 48:3; 50:24; 52:12, 17; 53:8, 19; 54:1, 13
**EXAMINATION** [5] - 5:10; 27:13; 28:6; 45:22; 54:7
**examinations** [18] - 6:3, 9; 11:18, 23; 18:8, 13, 19-20; 19:16; 24:8, 24; 26:19, 24; 35:22; 43:10; 44:12, 25
**examine** [3] - 18:21; 25:19; 26:4
**examined** [3] - 5:3; 8:11; 9:11
**exams** [1] - 22:10
**exception** [1] - 56:9
**exchange** [1] - 40:7
**exchanging** [1] - 41:25
**excuse** [1] - 24:25
**existed** [1] - 19:11
**experience** [1] - 58:21
**explain** [1] - 10:18
**explaining** [1] - 50:22
**explanation** [6] - 33:18; 49:12; 53:8, 18, 25; 54:2
**expose** [1] - 23:18
**exposure** [1] - 19:21
**expressed** [2] - 22:20; 35:17
**extent** [1] - 8:24
**external** [1] - 19:9

## F

**face** [6] - 27:21; 29:11, 16
**face-to-face** [2] - 29:11, 15
**facility** [1] - 35:9
**facing** [1] - 35:21
**fact** [3] - 15:18; 47:10; 54:1
**facts** [1] - 51:17
**fair** [1] - 7:22
**false** [6] - 20:10; 21:1, 20; 47:13; 49:16
**familiar** [1] - 26:10
**far** [3] - 24:11; 55:4
**feared** [1] - 18:2
**February** [4] - 29:8, 16; 30:12; 31:18; 34:2; 35:18; 45:5; 47:19; 48:22; 50:15; 51:4

**feet** [1] - 10:3
**felt** [2] - 32:1; 38:14
**female** [12] - 10:1, 22; 14:5; 18:3, 12, 22; 19:10; 24:20; 44:1, 12, 25
**female's** [1] - 26:13
**females** [3] - 10:23; 36:5; 57:14
**few** [2] - 28:8; 54:6
**file** [3] - 34:18; 38:25; 39:1
**filed** [2] - 37:17; 40:23
**filing** [2] - 47:22; 53:1
**fill** [4] - 8:13, 16; 25:10; 26:5
**filled** [1] - 8:21
**findings** [1] - 34:14
**fine** [3] - 32:16; 50:3; 58:23
**finish** [1] - 23:10
**first** [11] - 5:2; 17:6, 14, 16; 27:18, 22; 30:18; 35:12; 48:14; 54:24; 55:23
**flag** [1] - 47:15
**folks** [1] - 15:7
**follow** [4] - 45:21; 47:21; 53:11, 16
**follow-up** [3] - 47:21; 53:11, 16
**follow-ups** [1] - 45:21
**following** [3] - 14:2, 17; 15:4
**follows** [1] - 5:3
**FORCH** [6] - 20:2, 12; 21:3; 25:16; 27:11; 58:3
**forget** [1] - 23:23
**forgotten** [2] - 36:20; 37:22
**Form** [1] - 20:3
**form** [41] - 7:8, 14, 17, 19; 8:12, 16, 19, 25; 9:4; 10:6; 11:1, 3-4, 6, 9, 21; 12:3; 19:18, 24; 20:2, 11-12; 21:2, 9; 22:8, 10, 17; 23:5; 26:3, 10-12, 15; 27:24; 43:3; 44:13; 48:4; 51:17; 57:12
**formal** [1] - 34:18
**formed** [2] - 10:1, 19
**forms** [4] - 22:11; 25:11, 18, 23
**formulation** [1] - 41:23
**forth** [3] - 14:3; 15:5; 43:2
**forward** [1] - 18:13
**foundation** [8] - 11:3; 14:7; 20:2; 25:16; 32:18; 44:13; 51:17
**foundational** [1] - 12:6
**four** [1] - 55:17
**friend** [1] - 48:11
**front** [1] - 22:2
**fully** [1] - 45:5
**future** [1] - 28:11

## G

**Gary** [1] - 57:8
**general** [1] - 43:19
**generally** [1] - 50:11
**genitalia** [4] - 6:16; 10:5; 14:6; 19:22
**given** [3] - 18:14; 20:9; 47:13
**governor** [1] - 41:11
**Grand** [1] - 29:19
**ground** [1] - 29:3
**guess** [1] - 6:14
**guidelines** [3] - 15:4; 41:24; 43:2
**guys** [1] - 12:7
**gynecologist** [1] - 25:10

## H

**half** [3] - 17:25; 31:23; 40:21
**happy** [1] - 39:13
**harassed** [2] - 31:25; 32:14
**Haudrich** [10] - 14:2, 17; 15:1, 22; 16:2; 18:4; 21:8; 26:18; 27:15, 24
**Haudrich's** [4] - 15:7, 17; 18:19; 33:17
**healthcare** [1] - 26:22
**hear** [1] - 12:7
**heard** [6] - 6:8; 30:19; 33:25; 36:21; 55:7; 56:10
**help** [1] - 12:11
**hemorrhoids** [3] - 22:21; 25:20; 26:1
**hereinafter** [1] - 5:3
**hernia** [8] - 19:23; 48:3; 49:14; 52:13; 53:9, 13; 57:13, 23
**hernias** [2] - 19:11; 20:19
**herself** [1] - 23:18
**history** [4] - 22:25; 23:2, 7, 13
**hold** [1] - 5:18
**honestly** [1] - 31:8
**hostile** [1] - 32:14
**house** [1] - 56:7
**HR** [5] - 13:14; 14:18; 23:25; 34:9; 35:8
**human** [2] - 33:16; 55:25
**hurt** [1] - 48:10
**hurts** [1] - 48:8

## I

**ignore** [1] - 38:17
**illegal** [1] - 47:6
**immediately** [2] - 41:25; 55:15
**important** [1] - 47:10
**improper** [2] - 36:6; 44:10
**incident** [1] - 36:13

**inconsistent** [1] - 51:18
**indicated** [1] - 47:22
**indication** [1] - 38:24
**infection** [1] - 23:14
**infections** [3] - 14:14; 23:4; 26:6
**inform** [1] - 39:25
**information** [9] - 17:5; 19:14; 20:25; 24:10; 40:8; 42:1; 44:7; 47:13; 53:17
**informed** [2] - 33:10; 40:1
**inquire** [1] - 54:14
**inquiry** [1] - 34:25
**inspect** [1] - 26:13
**inspection** [1] - 14:5
**instance** [1] - 42:10
**instruct** [1] - 10:20
**instructed** [5] - 12:2; 14:23; 35:7; 38:9
**intend** [1] - 10:22
**intention** [4] - 10:1, 19; 11:6, 10
**interaction** [1] - 24:6
**interactions** [1] - 24:9
**interview** [4] - 47:5; 50:7; 52:5
**interviewed** [1] - 50:11
**invasive** [2] - 20:8; 48:3
**investigate** [3] - 18:18; 33:4; 45:6
**investigated** [1] - 31:1
**investigating** [3] - 15:15; 46:21, 23
**investigation** [14] - 34:19; 36:12, 22; 37:25; 39:23; 40:18; 41:8; 44:8; 45:11, 15; 47:14; 53:12, 16
**investigations** [1] - 36:10
**investigator** [2] - 46:19; 47:1
**investigators** [1] - 43:21
**involved** [3] - 40:18; 47:6; 56:4
**involvement** [3] - 24:11; 29:3; 41:8
**Island** [1] - 29:19
**issue** [1] - 51:11
**issued** [1] - 37:7
**itching** [1] - 23:1

## J

**Jensen** [10] - 13:14; 14:19; 15:6; 23:25; 24:1-3; 34:10; 35:8; 55:10
**Jerry** [7] - 13:14; 14:19; 15:6; 23:25; 34:10; 35:8; 55:10
**Jessica** [1] - 27:10
**Jesus** [1] - 52:2
**job** [1] - 32:1
**join** [1] - 20:14

**judge** [1] - 50:2
**jump** [1] - 27:9
**June** [1] - 41:14
**jurisdiction** [1] - 42:20
**jury** [1] - 46:14

## K

**Kearney** [1] - 30:5
**key** [1] - 10:10
**kind** [6] - 32:22; 36:12; 40:14; 42:6; 58:15
**kinds** [1] - 22:11
**knees** [1] - 10:5
**knowledge** [11] - 15:14; 16:20, 25; 18:15; 35:11, 21; 42:9, 14, 19; 45:7; 53:12

## L

**labia** [2] - 26:4, 13
**last** [7] - 5:25; 21:12; 27:8; 29:8; 33:24; 41:6; 45:13
**late** [5] - 29:18; 30:9
**law** [4] - 32:8; 42:2; 47:14
**lawful** [1] - 5:2
**lawsuit** [3] - 37:15, 17; 44:19
**lawsuits** [1] - 41:16
**lawyer** [1] - 38:10
**lay** [2] - 10:2; 28:9
**laymen's** [1] - 15:3
**leading** [1] - 32:4
**learn** [6] - 16:10; 17:23; 21:6, 20; 33:7; 52:19
**learned** [10] - 20:15; 21:11; 24:14; 34:2; 41:7, 16; 45:15; 49:25; 55:8
**least** [4] - 6:21; 30:17; 35:10; 38:22
**leave** [2] - 38:20; 52:24
**Lee** [7] - 13:14; 14:19; 15:6; 23:25; 34:10; 35:8; 55:10
**left** [2] - 21:23; 45:16
**legal** [12] - 18:25; 21:12; 32:5, 14; 34:9; 35:7; 37:13; 38:10; 39:8; 46:15; 56:3, 9
**legally** [1] - 32:15
**legitimate** [2] - 21:7; 52:16
**legs** [1] - 10:3
**letter** [5] - 19:9; 20:21, 23; 52:5; 56:25
**lied** [1] - 47:9
**lieutenant** [1] - 17:4
**Lieutenant** [2] - 34:7; 55:13
**Lift** [1] - 9:16
**lightly** [1] - 35:15
**listen** [3] - 12:17; 13:6; 51:24
**loaded** [1] - 32:15
**look** [1] - 17:20; 25:2; 26:11;

30:14; 33:16; 40:20; 46:4; 48:3; 49:13; 53:9
**looked** [1] - 47:11
**looking** [3] - 22:3; 35:14; 39:15
**lost** [4] - 12:14; 35:14; 38:19; 39:16
**loud** [1] - 22:2

### M

**ma'am** [1] - 5:5
**mail** [8] - 48:2; 49:12; 50:22; 51:2, 5; 52:5; 56:25; 57:7
**main** [1] - 52:10
**major** [3] - 33:14; 55:20; 56:6
**Major** [1] - 34:8
**male** [4] - 9:19, 21; 24:20
**males** [1] - 57:13
**manner** [2] - 43:9; 44:10
**March** [6] - 29:1, 4; 47:18; 48:1; 57:8
**matter** [3] - 23:23; 33:23; 38:14
**matters** [3] - 36:12; 41:3
**mean** [5] - 10:18; 19:3; 26:10; 38:20; 48:9
**medical** [8] - 6:3; 19:2; 35:9, 22; 41:24; 43:2; 44:5, 25
**medically** [1] - 45:1
**meeting** [24] - 13:12; 16:13, 16; 21:12; 27:19, 22; 28:2; 29:12, 15, 20, 23-24; 30:18; 33:21; 34:7; 35:18; 55:6, 9, 13, 16, 18; 56:11, 18, 22
**members** [1] - 43:21
**memorandums** [1] - 34:19
**memory** [2] - 12:25; 13:3
**mentioned** [4] - 45:24; 46:3; 52:20; 53:4
**met** [4] - 27:16; 30:2; 31:19, 25
**method** [1] - 44:11
**might** [2] - 15:21; 47:22
**mind** [1] - 38:23
**mine** [1] - 58:3
**minute** [2] - 27:3; 52:20
**mission** [1] - 40:4
**modifying** [1] - 58:13
**moment** [1] - 5:7
**months** [2] - 25:6; 54:23
**morning** [2] - 29:18; 30:10
**motion** [1] - 46:11
**mouth** [1] - 21:10
**movements** [2] - 6:15; 23:1
**MR** [85] - 5:6, 11; 7:19, 22-23, 25; 10:6, 13; 11:1, 5, 7, 9, 12; 12:5, 10, 14, 16-17, 21, 25; 13:2, 4-5;

14:7-9; 17:19; 19:18, 24; 20:3, 11, 14; 21:2, 9; 25:22; 26:7; 27:2, 6, 8, 10, 12, 14; 28:4, 7; 32:4, 7, 10, 14, 16, 18-19; 44:13, 16-18; 45:18, 20, 23; 48:4, 7-8, 10; 49:19, 21-22; 50:1, 3; 51:7, 10-11, 14-16, 20, 22; 52:2; 54:4, 6, 8; 58:1, 5
**MS** [6] - 20:2, 12; 21:3; 25:16; 27:11; 58:3
**music** [1] - 13:5

### N

**nail** [1] - 30:17
**name** [1] - 5:12
**nature** [9] - 6:3, 8; 7:14; 16:11; 33:7; 41:17; 42:9; 49:13; 53:18
**Nebraska** [14] - 5:15, 18; 11:21; 22:16; 31:20; 34:13; 42:13, 15-16, 19; 43:1, 25; 44:3, 9
**necessary** [6] - 10:21, 23; 12:4; 18:9; 19:10; 56:1
**necessity** [1] - 16:8
**need** [3] - 22:10; 58:23
**needed** [1] - 56:3
**negative** [1] - 7:2
**never** [3] - 47:1; 56:24
**new** [1] - 54:25
**next** [8] - 12:15, 21; 36:5, 23; 38:5; 40:17; 50:1; 55:14
**none** [1] - 44:6
**nonsense** [1] - 19:15
**note** [2] - 11:13; 58:15
**noted** [1] - 32:19
**nothing** [3] - 11:10; 48:10; 58:5
**notification** [1] - 40:22
**numerous** [1] - 41:3

### O

**oath** [1] - 5:5
**object** [16] - 7:19; 10:6; 11:1; 14:7; 19:18, 24; 20:11; 21:2, 9; 32:9; 48:4; 49:19; 51:7
**objecting** [1] - 51:21
**objection** [10] - 11:8, 13; 12:6; 20:14; 32:4, 18; 44:13; 51:14
**obtained** [1] - 31:19
**obviously** [1] - 56:3
**occur** [1] - 41:13
**occurred** [2] - 28:16; 55:14
**occurring** [1] - 37:2
**off-the-record** [1] - 5:8
**office** [5] - 15:8; 33:15, 17;

37:8
**officer** [3] - 6:10; 42:13; 47:14
**officers** [4] - 16:17; 22:13, 16; 44:3
**official** [1] - 34:15
**once** [5] - 23:21; 24:14
**one** [20] - 5:14; 8:20; 15:6; 20:5, 7; 22:20; 23:4, 24; 27:19-21; 29:23; 30:11; 38:17; 39:20; 58:7, 19
**one-on-one** [1] - 29:23
**ongoing** [1] - 38:2
**open** [2] - 9:7; 10:5
**order** [4] - 6:9; 16:7; 26:5; 46:6
**original** [2] - 34:21
**ought** [1] - 52:2
**outline** [1] - 44:24
**own** [1] - 54:12

### P

**pain** [1] - 23:2
**painful** [1] - 23:13
**pants** [1] - 10:2
**part** [5] - 8:13; 10:10; 24:6; 46:24; 47:4
**participated** [1] - 56:21
**particular** [1] - 55:17
**parts** [2] - 19:10; 26:4
**party** [1] - 44:1
**pass** [2] - 10:22, 24
**patient** [1] - 25:19
**patrol** [32] - 6:5, 10, 22; 7:8; 8:2, 12; 9:25; 13:13; 17:13, 18, 23; 18:5; 21:24; 25:1; 26:23; 28:20; 31:15; 33:8, 25; 34:15; 36:10, 15; 37:7, 24; 41:2, 23; 43:21; 44:11, 14, 20; 46:5, 24
**Patrol** [9] - 11:21; 31:20; 34:13; 42:15, 19; 43:1, 25; 44:3, 9
**patrol-issued** [1] - 37:7
**paying** [1] - 40:11
**peace** [1] - 22:13
**pending** [1] - 41:3
**people** [4] - 18:18; 37:23; 47:5; 55:18
**perform** [6] - 21:7; 24:18, 23; 25:2; 26:17, 24
**performed** [7] - 6:12; 15:22; 16:3, 7; 18:20; 21:8, 19
**performing** [2] - 9:22; 26:19
**perhaps** [1] - 30:17
**period** [1] - 37:21
**personal** [9] - 11:17; 20:9; 24:19; 25:1, 10; 35:18; 50:7; 54:12, 21

**personally** [8] - 15:20, 25; 26:13; 47:17; 48:15, 20; 50:6, 12
**personnel** [1] - 15:7
**petition** [1] - 46:9
**phone** [7] - 37:1; 39:18; 40:15; 47:22; 49:5; 52:6; 56:17
**phoned** [1] - 37:6
**phonographic** [3] - 12:25; 13:2, 4
**physical** [15] - 6:9; 7:9; 8:4, 13; 9:20; 10:24; 16:12; 22:15; 27:23; 31:22; 33:1; 35:21; 42:11; 44:11
**physically** [1] - 18:21
**physician** [11] - 9:7, 13, 21; 14:2; 24:19; 25:2, 24; 26:16, 18; 54:12, 21
**physicians** [6] - 6:21; 10:21; 11:16, 25; 16:5; 18:20
**place** [2] - 28:20; 37:5
**placing** [1] - 21:10
**plaintiff** [1] - 28:15
**plaintiff's** [1] - 55:8
**play** [2] - 48:19; 55:1
**pleadings** [1] - 46:15
**point** [6] - 18:7; 22:1; 25:8; 28:1; 33:8; 53:7
**police** [3] - 22:16; 42:12
**Police** [3] - 22:14; 42:5; 43:12
**politely** [1] - 48:19
**poor** [1] - 36:22
**portion** [3] - 10:16; 12:19, 23
**posed** [1] - 36:4
**position** [1] - 5:17
**positions** [1] - 5:17
**possible** [1] - 54:11
**postures** [1] - 6:15
**potential** [1] - 18:21
**powers** [1] - 43:16
**practice** [1] - 19:2
**precipitated** [1] - 35:6
**precise** [2] - 8:9; 28:24
**precondition** [1] - 6:4
**preemployment** [1] - 8:13
**prepare** [2] - 45:25
**prepared** [1] - 7:17
**presently** [1] - 31:24
**pretty** [1] - 58:21
**previously** [1] - 56:13
**privilege** [1] - 58:19
**privileges** [1] - 58:7
**pro** [1] - 8:16
**problem** [2] - 8:7; 23:1
**procedure** [8] - 7:3; 10:21; 15:3; 24:16, 19; 36:7; 43:9; 54:25

**procedures** [7] - 15:1, 11, 18; 16:1; 26:17; 44:24; 56:1
**produce** [1] - 34:11
**prohibit** [1] - 18:8
**proper** [2] - 29:25; 30:1
**properly** [1] - 45:5
**protocols** [1] - 40:2
**provide** [2] - 26:23; 53:17
**provided** [1] - 21:18
**provider** [1] - 26:23
**provisions** [2] - 24:25; 25:1
**PSAC** [6] - 14:3; 15:5, 13; 24:17; 57:12, 24
**pull** [1] - 10:4
**purpose** [3] - 9:14; 23:18; 58:12
**purposes** [1] - 58:11
**put** [5] - 10:3; 36:12; 38:4; 54:25; 58:15

**Q**

**qualifications** [1] - 25:3
**qualify** [1] - 11:23
**questions** [16] - 8:8; 9:4; 13:21; 27:7, 11; 28:8; 39:3; 45:19; 48:16; 51:25; 52:1; 54:4; 55:6; 58:2, 4
**quote** [1] - 57:11

**R**

**R-i-c-e** [1] - 5:13
**raised** [6] - 16:16, 20; 17:5, 14, 16; 38:16
**re** [1] - 10:10
**read** [6] - 10:13; 12:10, 12, 16; 58:7, 20
**real** [1] - 19:16
**reason** [12] - 19:16; 20:8; 21:7, 18; 28:16; 44:22; 48:2; 49:18; 50:24; 52:12, 16
**receive** [1] - 13:18
**received** [7] - 13:23; 19:14; 33:18; 40:22; 48:2; 49:11, 13
**receiving** [1] - 53:25
**recess** [1] - 27:4
**recollection** [5] - 8:20; 30:7; 31:7, 16; 33:21
**recommendation** [3] - 43:15; 54:10, 13
**recommendations** [2] - 43:5, 8
**recommended** [1] - 43:14
**record** [7] - 5:6, 8; 10:16; 12:19, 23; 27:3; 28:14
**records** [1] - 46:5
**RECROSS** [1] - 54:7

**RECROSS-EXAMINATION** [1] - 54:7
**recruiting** [1] - 56:2
**red** [1] - 47:15
**REDIRECT** [1] - 45:22
**reference** [1] - 28:11
**referred** [1] - 22:9
**regard** [1] - 24:7
**regarding** [4] - 6:2; 14:13; 16:11; 36:10
**regulation** [2] - 57:12, 24
**related** [2] - 32:2; 42:2
**relieved** [2] - 45:9, 14
**remember** [12] - 8:24; 28:24; 29:14, 17; 36:23; 38:5; 40:5, 17; 52:4; 55:15; 56:15; 58:14
**remove** [1] - 10:2
**repeat** [1] - 10:11
**repeated** [3] - 10:17; 12:20, 24
**repeatedly** [1] - 22:9
**rephrase** [1] - 48:17
**report** [4] - 14:25; 15:9; 34:14; 56:24
**reported** [1] - 19:1
**reportedly** [1] - 57:23
**reporter** [1] - 58:9
**REPORTER** [1] - 10:15
**reporters** [1] - 58:21
**reports** [5] - 13:18, 22, 24; 14:16; 24:15
**representing** [1] - 39:10
**requested** [3] - 10:16; 12:19, 23
**require** [2] - 10:22; 44:17
**required** [15] - 6:4, 9, 13, 15, 21; 7:17; 8:12; 10:23; 14:6, 17, 25; 19:22; 23:18; 31:14; 35:22
**requirement** [2] - 57:12, 24
**requirements** [3] - 14:3; 15:12; 24:17
**requiring** [1] - 7:9
**research** [2] - 14:23
**resources** [2] - 33:16; 55:25
**response** [7] - 5:5; 33:3, 9; 34:16, 25; 35:6; 36:21
**responsibility** [1] - 38:15
**restated** [1] - 18:2
**result** [1] - 40:7
**resulted** [1] - 44:8
**retired** [1] - 5:21
**return** [1] - 17:17
**review** [2] - 46:3, 6
**reviewed** [1] - 46:16
**RICE** [1] - 5:1
**rice** [1] - 5:13
**Rice** [3] - 5:14; 6:1; 8:8

**role** [2] - 28:23; 41:22
**room** [1] - 51:23
**rough** [1] - 31:5
**roughly** [1] - 5:20
**rule** [2] - 25:25; 26:6
**rumor** [1] - 37:17
**run** [1] - 11:22
**Russell** [2] - 34:8; 55:9

**S**

**saw** [3] - 14:10; 20:21; 56:25
**scheduled** [2] - 29:11; 30:1
**school** [1] - 32:8
**Schwerten** [3] - 34:7; 55:9, 13
**see** [7] - 11:22; 14:4; 16:1; 30:15; 31:17; 34:18; 47:5
**seeing** [1] - 14:13
**send** [1] - 51:22
**sent** [4] - 15:6; 50:22; 51:2; 57:7
**September** [2] - 28:16; 29:6
**sequential** [1] - 51:25
**sergeants** [1] - 17:3
**series** [1] - 6:14
**services** [4] - 33:14; 55:20; 56:6, 9
**Services** [1] - 34:8
**set** [4] - 14:3; 15:4; 29:21; 43:2
**sets** [5] - 22:15; 42:1, 11; 55:25
**setting** [1] - 56:1
**settle** [1] - 51:8
**sexual** [1] - 44:1
**sexually** [1] - 23:6
**shows** [1] - 28:14
**shuffle** [1] - 38:19
**side** [1] - 56:7
**sign** [2] - 58:7, 20
**signature** [1] - 58:18
**Simple** [1] - 50:5
**simple** [1] - 14:9
**simply** [3] - 19:15, 23; 54:11
**six** [2] - 25:6; 54:23
**solemnly** [1] - 5:2
**sometime** [2] - 30:9; 34:1
**songs** [1] - 13:5
**sorry** [3] - 23:11; 52:22; 53:14
**sort** [3] - 29:2; 42:1; 56:25
**soup** [1] - 41:21
**specific** [2] - 40:5; 47:2
**speculate** [1] - 31:11
**spent** [1] - 46:21
**Splitt** [1] - 8:20
**Splittgerber** [48] - 6:2, 14; 8:21; 15:23; 16:6, 16; 17:14; 18:2, 14; 19:21, 25;

20:19; 21:20; 23:12, 16; 24:7; 25:9, 13; 26:20, 25; 29:5, 22; 31:3, 18; 33:21; 34:25; 36:13, 19; 37:1, 10; 40:15; 45:4, 10; 47:18; 48:1, 15, 20; 49:11; 50:6, 12, 17, 22; 52:5, 7, 11, 25; 53:19, 24
**Splittgerber's** [15] - 6:7, 17; 7:13; 8:14; 13:16; 16:11; 17:24; 22:25; 23:22; 24:23; 30:19; 35:12; 43:22; 50:23; 52:6
**staff** [6] - 12:2; 13:10, 12; 30:24; 33:24; 54:17
**Stanczyk** [3] - 34:8; 37:24; 55:9
**standard** [1] - 22:15
**Standards** [2] - 22:14; 42:5; 43:12
**standards** [5] - 14:3; 22:15; 42:2, 11
**started** [1] - 41:25
**starting** [1] - 45:4
**state** [39] - 5:12; 6:5, 10, 22; 7:8; 8:2, 12; 10:25; 13:13, 22; 16:17; 17:13, 23; 18:5; 21:24; 22:16; 25:1; 26:23; 28:19; 31:15; 33:8, 25; 34:15; 36:10, 14; 37:23; 38:23; 41:2, 23; 42:13, 16; 43:21; 44:11, 14, 20, 23; 46:5, 24
**State** [12] - 5:15, 18; 11:21; 17:9; 31:20; 34:13; 42:15, 19; 43:1, 25; 44:3, 9
**statement** [1] - 26:2
**stating** [1] - 7:17
**stationed** [1] - 30:5
**status** [4] - 32:1; 33:4; 39:23; 45:10
**steps** [1] - 24:4
**still** [4] - 21:18, 21; 35:14; 39:15
**stop** [3] - 18:8; 21:15, 17
**strike** [1] - 36:22
**subject** [4] - 18:3, 13; 29:24; 36:6
**submit** [2] - 7:9; 31:14
**subsequently** [2] - 28:12; 47:9
**subset** [1] - 42:6
**suggested** [1] - 44:8
**superintendent** [18] - 5:24; 7:21; 17:17; 20:15, 22; 28:23; 29:4; 30:24; 34:13, 20; 38:15; 41:11; 42:18; 43:1, 17; 44:9, 20
**superintendent's** [2] - 33:15
**supposedly** [1] - 56:21

**sworn** [5] - 5:2, 17; 28:24; 31:20; 44:3
**symptoms** [1] - 23:14

# T

**table** [1] - 10:3
**talks** [1] - 48:20
**technique** [2] - 10:23, 25
**techniques** [2] - 15:10, 16
**term** [2] - 15:11; 25:4
**terms** [2] - 15:4; 32:15
**testified** [4] - 5:3; 28:22; 41:1; 43:13
**testify** [1] - 46:7
**testimony** [4] - 28:10; 29:10; 51:18
**THE** [2] - 10:15; 58:24
**thinking** [1] - 53:1
**timeline** [13] - 7:20; 29:6; 37:21; 40:20; 45:24; 46:3, 6; 49:20; 51:12; 52:9
**timelines** [1] - 12:7
**timing** [1] - 48:6
**today** [4] - 27:16; 46:7; 57:9
**together** [2] - 10:4; 58:10
**took** [4] - 28:20; 31:23; 37:5; 38:20
**totally** [1] - 20:9
**tract** [5] - 14:14; 23:4, 7, 14; 26:6
**trained** [1] - 46:18
**training** [10] - 17:2; 29:19; 30:2; 33:12; 44:5; 47:3; 55:21, 24; 56:2
**transcribe** [1] - 58:17
**transcript** [1] - 58:10
**transmitted** [2] - 23:6; 33:19
**troop** [1] - 16:17
**trooper** [8] - 5:21; 7:18; 8:4; 31:20; 32:2; 35:25; 38:15; 54:11
**Trooper** [49] - 6:2, 13, 17; 7:13; 8:14, 20; 13:15; 15:23; 16:6, 10, 15; 17:13, 24; 18:1, 14; 19:21; 20:18; 21:19; 22:24; 23:12, 16, 22; 24:7; 25:9, 13; 26:19, 25; 29:5, 22; 30:19; 31:3, 18; 34:24; 35:11; 36:13; 37:1, 10; 40:15; 43:22; 45:4; 47:17; 48:1, 14; 49:11; 50:11, 17; 52:11, 25; 53:19
**Troopers** [1] - 17:9
**troopers** [9] - 10:25; 11:24; 16:18; 18:12, 22; 20:8; 38:18; 44:25; 47:4
**true** [12] - 17:15; 19:23; 21:5, 20, 25; 25:12, 17, 21; 26:2;

35:19; 55:12; 57:3
**truly** [1] - 13:1
**try** [2] - 28:9; 41:21
**trying** [3] - 8:5; 38:22; 45:12
**two** [4] - 30:11; 48:1, 16; 49:10
**type** [5] - 15:22; 16:2; 18:9, 13; 58:17
**types** [2] - 21:8; 58:9

# U

**unclear** [2] - 54:9
**under** [1] - 57:24
**undergone** [1] - 53:19
**understood** [1] - 46:25
**underwear** [1] - 10:2
**uniformed** [1] - 47:2
**unknown** [2] - 29:24; 37:19
**unless** [2] - 18:9; 32:7
**unnecessary** [1] - 45:1
**unquote** [1] - 57:14
**up** [17] - 9:7, 17; 10:4; 29:21; 33:8, 13; 43:22; 44:1; 46:23; 47:21; 53:11, 16; 55:25; 56:1; 57:23; 58:9, 17
**update** [1] - 37:2
**ups** [1] - 45:21
**Urbanek** [3] - 57:12, 16, 22
**urinary** [5] - 14:13; 23:4, 7, 14; 26:6
**urination** [1] - 23:13

# V

**vagina** [2] - 26:5, 13
**vaginas** [1] - 22:3
**various** [1] - 7:10
**verbal** [4] - 13:23, 25; 14:1, 16
**vernacular** [1] - 33:1
**visual** [1] - 14:5
**voiced** [1] - 34:6
**vulva** [1] - 26:4

# W

**waive** [3] - 58:16, 22, 24
**ways** [3] - 23:19; 40:3; 44:21
**week** [2] - 40:21
**weird** [1] - 22:3
**Wendy** [11] - 13:13; 14:18, 22; 19:1; 34:8; 37:13, 24; 39:7; 55:10; 57:21
**WHITE** [31] - 5:6, 11; 7:22, 25; 10:13; 11:5, 9; 12:10, 16, 25; 13:4; 14:9; 27:2, 6; 32:4, 7, 14, 18; 44:13, 17; 45:20, 23; 48:8; 49:21; 50:1; 51:8, 11, 15, 20;

52:2; 54:4
**White** [20] - 8:1; 10:8, 20; 11:16; 13:7; 14:12; 17:22; 19:20, 25; 20:6, 17; 21:4, 14, 25:18, 23; 26:9; 48:5, 12; 50:5; 52:4
**why'd** [1] - 38:13
**Williams** [3] - 17:1; 33:13, 22
**wish** [1] - 58:8
**witness** [1] - 49:23
**WITNESS** [1] - 58:24
**Witness's** [1] - 5:5
**woman** [1] - 6:10
**women** [4] - 6:4, 13, 22; 15:20
**word** [2] - 15:2; 32:11
**words** [3] - 18:9; 21:10; 22:4
**written** [3] - 13:24; 34:14, 18
**wrote** [1] - 19:8
**Wussow** [23] - 13:13; 14:18, 22; 19:1, 8, 21; 20:18; 21:19; 23:23; 34:9; 37:14, 24; 39:7; 49:12; 50:21; 52:6, 12; 53:13, 17; 55:10; 57:8, 22
**Wussow's** [2] - 53:8, 25

# Y

**year** [5] - 5:25; 17:25; 29:8; 31:23; 50:20
**years** [3] - 9:1, 11; 46:21
**Young** [1] - 57:8

# Z

**zero** [1] - 29:3